## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x

PJM INTERCONNECTION, L.L.C., directly and )
derivatively on behalf of Power Edge, LLC, )
                                      )
               Plaintiff, )           C. A. No. 08-216-JJF
    v. )
                                        )

MARK GORTON, TOWER RESEARCH CAPITAL )
LLC, TOWER RESEARCH CAPITAL )
INVESTMENTS LLC, ACCORD ENERGY LLC, BJ )
ENERGY LLC, FRANKLIN POWER LLC, GLE )
TRADING LLC, OCEAN POWER LLC, PILLAR )
FUND LLC and POWER EDGE LLC, )
                                        )
              Defendants. )

-------------------------------------------------------------------- x

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO
## DISMISS UNDER FED. R. CIV. P. 9(b), 12(b)(1), 12(b)(5) AND 12(b)(6)

OF COUNSEL:

David B. Tulchin
Richard J.L. Lomuscio
Brian L. Frye
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Jesse A. Finkelstein (#1090)
Daniel A. Dreisbach (#2583)
Steven J. Fineman (#4025)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
dreisbach@rlf.com
fineman@rlf.com

*Attorneys for Defendants*

May 7, 2007

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

SUMMARY OF ARGUMENT ...............................................................................1

STATEMENT OF FACTS ...................................................................................3

STANDARD ON THIS MOTION ........................................................................11

ARGUMENT ...................................................................................................13

I.    PJM LACKS STANDING ........................................................................13

II.   PJM FAILS TO PLEAD A RICO CLAIM ..............................................14

    A.    PJM Fails to Plead Predicate Acts ............................................16

    B.    PJM Fails to Plead RICO Injury ...............................................20

III.  PLAINTIFF FAILS TO PLEAD MAIL AND WIRE FRAUD
    WITH PARTICULARITY ......................................................................21

IV.   THIS COURT LACKS SUBJECT MATTER JURISDICTION
    OVER PJM'S STATE LAW CLAIMS ..................................................23

V.    PJM DID NOT PROPERLY SERVE TRC OR MR. GORTON ...........23

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alexander* v. *Jenkins*,
  1990 WL 98960 (E.D. Pa. July 13, 1990) ....................................................................15

*Anderson* v. *Ayling*,
  396 F.3d 265 (3d Cir. 2005) ......................................................................................21

*Annulli* v. *Panikkar*,
  200 F.3d 189 (3d Cir. 1999) ................................................................................20, 21

*Bell Atlantic Corp.* v. *Twombly*,
  127 S. Ct. 1955 (2007) ..............................................................................................12

*Brokerage Concepts, Inc.* v. *U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998) ......................................................................................20

*Blount Financial Services, Inc.* v. *Walter E. Heller & Co.*,
  819 F.2d 151 (6th Cir. 1987) ....................................................................................20

*Crossroads Cogeneration Corp.* v. *Orange & Rockland Utils.*,
  969 F. Supp. 907 (D.N.J. 1997) ..................................................................................8

*Doddy* v. *Oxy USA, Inc.*,
  101 F.3d 448 (5th Cir. 1998) ....................................................................................23

*Doug Grant, Inc.* v. *Greate Bay Casino Corp.*,
  232 F.3d 173 (3d Cir. 2000) ..........................................................................17, 18, 21

*Durant* v. *ServiceMaster Co.*,
  159 F. Supp. 2d 977 (E.D. Mich. 2001) ....................................................................15

*Furnari* v. *Warden, Allenwood Fed. Correctional Inst.*,
  218 F.3d 250 (3d Cir. 2000) ........................................................................................8

*Genty* v. *RTC*,
  937 F.2d 899 (3d Cir. 1991) ................................................................................14, 17

*Gould Elecs., Inc.* v. *United States*,
  220 F.3d 169 (3d Cir. 2000) ......................................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Green* v. *Humphrey Elevator & Truck Co.,*
816 F.2d 877 (3d Cir. 1987) ...................................................................................13

*Hedges* v. *Musco,*
204 F.3d 109 (3d Cir. 2000) ..................................................................................23

*Holmes* v. *Sec. Investor Prot. Corp.,*
503 U.S. 258 (1992) ...............................................................................................21

*In re Ins. Brokerage Antitrust Litig.,*
2007 WL 2892700 (D.N.J. Sept. 28, 2007) ...........................................................15

*Kehr Packages, Inc.* v. *Fidelcor, Inc.,*
926 F.2d 1406 (3d Cir. 1991) ................................................................................17

*Lightning Lube* v. *Witco Corp.,*
4 F.3d 1153 (3d Cir. 1993) ....................................................................................20

*Lujan* v. *Defenders of Wildlife,*
504 U.S. 555 (1992) ...............................................................................................13

*Lum* v. *Bank of America,*
361 F.3d 217 (3d Cir. 2004) .........................................................................4, 13, 21

*Maio* v. *Aetna,*
221 F.3d 472 (3d Cir. 2000) ..................................................................................11

*Mathews* v. *Kidder, Peabody & Co.,*
161 F.3d 156 (3d Cir. 1998) ..................................................................................15

*Midwest Grinding Co., Inc.* v. *Spitz,*
976 F.2d 1016 (7th Cir. 1992) ...............................................................................18

*Mortensen* v. *First Fed. Sav. & Loan Ass'n,*
549 F.2d 884 (3d Cir. 1977) ..................................................................................12

*Phillips* v. *County of Allegheny,*
515 F.3d 224 (3d Cir. 2008) ..................................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Public Interest Research Group* v. *Magnesium Elektron*,
    123 F.3d 111 (3d Cir. 1997) ............................................................................14

*Reynolds* v. *East Dyer Dev. Co.*,
    882 F.2d 1249 (7th Cir. 1989) ........................................................................18

*Sedima, S.P.R.L.* v. *Imrex Co.*,
    473 U.S. 479 (1985) ........................................................................................15

*Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*,
    742 F.2d 786 (3d Cir. 1984) ....................................................................13, 21

*Shearin* v. *E.F. Hutton Group, Inc.*,
    885 F.2d 1162 (3d Cir. 1989) ..........................................................................20

*Spencer Bank, S.L.A.* v. *Seidman*,
    528 F. Supp. 2d 494 (D.N.J. 2008) ................................................................18

*Temple* v. *Haft*,
    73 F.R.D. 49 (D. Del. 1976) ............................................................................22

*Trump Hotels & Casino Resorts, Inc.* v. *Mirage Resorts Inc.*,
    140 F.3d 478 (3d Cir. 1998) ............................................................................13

*Warden* v. *McLelland*,
    288 F.3d 105 (3d Cir. 2002) ............................................................................18

## TABLE OF AUTHORITIES
### (continued)

<u>Page(s)</u>

### RULES AND STATUTES

Fed. R. Civ. P. 9 .............................................................................................1, 2, 12, 21, 22

Fed. R. Civ. P. 12 ...............................................................................................1, 2, 8, 11

16 U.S.C. § 824 ...................................................................................................................9

16 U.S.C. § 824v .................................................................................................................9

18 U.S.C. § 1341 ............................................................................................................2, 15

18 U.S.C. § 1343 ............................................................................................................2, 15

18 U.S.C. § 1961 ...............................................................................................................15

18 U.S.C. § 1962 ...........................................................................................................1, 15

18 U.S.C. § 1964 ...............................................................................................................20

28 U.S.C. § 1367 ...............................................................................................................23

6 Del C. § 18-109 ..............................................................................................................24

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS UNDER FED. R. CIV. P. 9(b), 12(b)(1), 12(b)(5) AND 12(b)(6)

Defendants Mark Gorton, Tower Research Capital LLC ("TRC"), Tower Research Capital Investments LLC ("TRCI"), Accord Energy LLC ("Accord"), BJ Energy LLC ("BJ Energy"), Franklin Power LLC ("Franklin Power"), GLE Trading LLC ("GLE Trading"), Ocean Power LLC ("Ocean Power"), Pillar Fund LLC ("Pillar Fund") and Power Edge LLC ("Power Edge") respectfully submit this opening brief in support of their Motion to Dismiss the Complaint pursuant to Rules 9(b), 12(b)(1), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure.

### NATURE AND STAGE OF THE PROCEEDINGS

This action was commenced on April 16, 2008, by PJM Interconnection, L.L.C. ("PJM"), alleging violations of sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and breach of fiduciary duty, conspiracy to breach a fiduciary duty, fraudulent conveyance, breach of contract and piercing the corporate veil under Delaware state law. The only basis for federal jurisdiction is the RICO claims; the other claims arise under state law, and PJM concedes that diversity jurisdiction is lacking. As set forth below, the facts underlying this action are currently subject to proceedings pending before the Federal Energy Regulatory Commission ("FERC").

### SUMMARY OF ARGUMENT

PJM's RICO claims are facially defective. There is nothing whatsoever improper about the conduct that PJM here alleges is unlawful — the formation of separate and legally distinct affiliated entities to trade, each for its own account, on PJM's markets.

This means that PJM cannot allege facts sufficient to show wrongful, let alone criminal, conduct. PJM's RICO claims complain of nothing more than ordinary, everyday business conduct by defendants: the formation of legal entities as permitted under Delaware law and trading on PJM's own markets by affiliates in a manner wholly consistent with PJM's own rules. The facial defects to the RICO claims require their dismissal. Indeed, there are five separate and independent grounds for dismissal of the complaint.

1. **PJM Lacks Standing**. PJM fails to allege facts sufficient to show that it — as opposed to its members — suffered an injury caused by defendants' alleged conduct. Without such an injury, PJM lacks standing and the complaint should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.

2. **PJM's RICO Claims Fail**. In order to set forth a viable RICO claim, PJM must allege that defendants engaged in at least two predicate acts. The predicate acts here invoked by plaintiff are that defendants participated in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, which prohibit the use of the mails or interstate wires for the purpose of carrying out a scheme or artifice to defraud. But PJM fails to allege facts sufficient to make out any such unlawful scheme.

3. **PJM Fails to Allege Mail or Wire Fraud with Particularity**. Under Rule 9(b), a plaintiff alleging fraud must plead the fraudulent statement with particularity by identifying the purpose of the statement in the allegedly fraudulent scheme and specifying the fraudulent statement as well as the time and place it was made, its speaker and the content of the alleged misrepresentations. PJM makes no such particularized allegations and identifies no false or misleading statements.

4.    **This Court Lacks Subject Matter Jurisdiction Over PJM's State Law Claims**. Because PJM's RICO claims are meritless and should be dismissed, this Court should decline to exercise supplemental jurisdiction over PJM's state law claims. Diversity jurisdiction does not exist here because, as the complaint alleges, plaintiff PJM is a Delaware limited liability company and so are all defendants other than TRC and Mr. Gorton himself.

5.    **TRC and Mr. Gorton Were Not Properly Served**. PJM attempted to serve TRC by serving the Secretary of State of Delaware, and attempted to serve Mr. Gorton by serving the Lime Group LLC ("Lime Group") in Delaware. Service in both instances was improper and ineffective.

## STATEMENT OF FACTS

*The Defendants*. Defendants Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge are separate Delaware limited liability companies that invest in the energy markets. (Compl. ¶¶ 8, 46-47, 55, 63, 70, 87, 95, 103, Exs. A-O.) Each of these seven companies is a separate legal entity. (Compl. ¶¶ 8, 55, 63, 70, 78, 87, 95, 103.) Each is affiliated with the others and also with TRC and TRCI, two other separate legal entities, and Mr. Gorton. (Compl. ¶¶ 56, 64, 71, 88, 96, 104, Exs. A-O.) Mr. Gorton is also a director of the Lime Group, a company which is not a party to this action (Compl. ¶ 5) and as to which there are no allegations of wrongdoing.

At different times between August 2005 and July 2007, Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge each applied for and became a member of plaintiff PJM. (Compl. ¶¶ 59, 66, 73, 81, 90, 98, 106.) Becoming a member of PJM permitted these entities to trade on PJM's markets. (Lomuscio Decl. Ex. A

§§ 1.21-1.24, 11.6.) The membership applications of each of these seven entities are appended to the complaint as Exhibits A, C, E, G, J, L and N; each application truthfully states the relationship of each entity with the other defendants existing at the time the application was submitted to PJM. PJM does not contend otherwise.

       *PJM and Its Markets.* PJM is a Delaware limited liability company with its principal place of business in Norristown, Pennsylvania that operates several electronic markets for energy and financial rights and obligations related to energy. (Compl. ¶¶ 4, 23.) PJM's markets are regulated by FERC. (Lomuscio Decl. Ex. A § 3.1.) These markets and PJM operate pursuant to FERC-approved rules contained in the PJM Open Access Transmission Tariff (the "Tariff") and the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. (the "Operating Agreement").[1] (Compl. ¶ 44; Lomuscio Decl. Ex. A, Ex. B.) PJM has more than 500 members. (Lomuscio Decl. Ex. A at Schedule 12 ("PJM Member List").) Becoming a member of PJM provides access to PJM's markets, and PJM's members include both electric utilities and investors in the energy markets such as defendants. (Compl. ¶ 39.)

---

[1]     When deciding a motion to dismiss, the Court should consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record and documents that form the basis of the claim." *Lum* v. *Bank of America*, 361 F.3d 217, 222 (3d Cir. 2004). The Operating Agreement is referenced in paragraphs 44 and 45 of the complaint and the Tariff is referenced in the PJM membership applications attached as Exhibits A, C, E, G, J, L and N of the complaint, so these documents are properly considered in connection with a Rule 12(b)(6) motion. Relevant portions of the Operating Agreement and the Tariff are excerpted and attached as Exhibits A and B, respectively, to the Declaration of Richard J.L. Lomuscio ("Lomuscio Decl."), executed on May 7, 2008 and submitted in support of this Motion to Dismiss.

PJM members meeting the "reasonable creditworthiness standards established by [PJM]" are authorized to trade in PJM's markets. (Lomuscio Decl. Ex. A §§ 1.21-1.24, 11.6.) PJM gave its authorization to Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge to trade in PJM's markets. (Lomuscio Decl. Ex. A at Schedule 12 ("PJM Member List").) Of course, trading by these entities was subject to and governed by PJM's rules — i.e., the PJM Operating Agreement and the Tariff, both of which were approved by the federal agency (FERC) that regulates PJM. (Lomuscio Decl. Ex. A at 1, Ex. B at 1.)

Among PJM's markets is a market for "financial transmission rights," or "FTRs." (Compl. ¶¶ 4, 34, 37, 39.) An FTR is essentially a forward contract in energy transmission. (Compl. ¶¶ 40, 42.) The cost of transmitting energy increases when the energy transmission system becomes congested. (Compl. ¶ 36.) An FTR grants its holder the right to receive credits based on actual congestion on electricity transmission pathways. (Compl. ¶¶ 36, 41, 43.) The ultimate value of an FTR depends on the congestion of energy transmission between two geographic locations during a specified period of time. (Compl. ¶ 36.)

At any given time, an FTR may either be prevailing flow or counterflow. (Compl. ¶ 38.) The value of prevailing flow FTRs increases if actual congestions costs are higher than expected congestion costs for the given FTR. (Compl. ¶ 40.) Conversely, the value of a counterflow FTR increases if actual congestion costs are lower than expected congestion costs for the given FTR. (Compl. ¶ 42.)

Because trading in FTRs may result in a loss for any PJM member, there is the possibility that a member who has placed a losing bet may default. (Compl. ¶ 44.) To address the possibility of defaults, the PJM Operating Agreement provides that, if a PJM member with an FTR obligation defaults, then the amount of that default can be allocated to all other PJM members according to a formula contained in the Operating Agreement. (Compl. ¶¶ 44-45; Lomuscio Decl. Ex. A § 15.2.)[2] In essence, this default allocation rule requires that all non-defaulting PJM members bear responsibility for a portion of any default in the PJM market. (Compl. ¶¶ 44-45; Lomuscio Decl. Ex. A § 15.2.) PJM itself simply administers the allocation process and is not financially responsible for the default. (Lomuscio Decl. Ex. A § 15.2.) When PJM members are charged for another member's

_____

[2]    The full text of the "Enforcement of Obligations" section of the PJM Operating Agreement, which includes reference to Default Allocation Assessment, is as follows:

> 15.2 Enforcement of Obligations. If the Office of the Interconnection sends a notice to the PJM Board that a Member has failed to perform an obligation under this Agreement, the PJM Board shall initiate such action against such Member to enforce such obligation as the PJM Board shall deem appropriate. Subject to the procedures specified in Section 15.1, a Member's failure to perform such obligation shall be deemed to be a default under this Agreement. In order to remedy a default, but without limiting any rights the LLC may have against the defaulting Member, the PJM Board may assess against, and collect from, the Members not in default, in proportion to their Default Allocation Assessment, an amount equal to the amount that the defaulting Member has failed to pay to the Office of the Interconnection, along with appropriate interest. Such assessment shall in no way relieve the defaulting Member of its obligations. A Member that has paid such an assessment to the LLC shall have an independent right to seek and obtain payment and recovery from the defaulting Member of the amount of the assessment the Member paid to the LLC. In addition to any amounts in default, the defaulting Member shall be liable to the LLC for all reasonable costs incurred in enforcing the defaulting Member's obligations.

(Lomuscio Decl. Ex. A § 15.2.)

default, the Operating Agreement refers to this event as a "Default Allocation Assessment." (Compl. ¶ 44; Lomuscio Decl. Ex. A § 15.2.) The rules in the PJM Operating Agreement, however, do not provide that one affiliate is responsible for the bad trades or losses of another affiliate. As shown below, both PJM and its lawyers have recognized this fact and PJM's effort to promulgate a contrary rule has been rejected by FERC.

*Power Edge's Trades and Its Default.* In early 2007, Power Edge participated in PJM's annual FTR auctions. (Compl. ¶ 116.) In these auctions, Power Edge acquired a portfolio which consisted mostly of counterflow FTRs. (Compl. ¶¶ 117-19.) Power Edge's position was a bet that there would be low congestion during the terms of its counterflow FTRs. (Compl. ¶ 125.) This turned out to be a bad bet. (Compl. ¶ 126.)

A number of unplanned and rescheduled transmission outages, including an outage announced in late November 2007, adversely affected Power Edge's counterflow FTRs. (Compl. ¶¶ 125-27.) As a result of a dramatic increase in congestion, Power Edge's counterflow FTRs resulted in significant losses — in the many millions of dollars. (Compl. ¶ 126.) These losses caused Power Edge to default in December 2007. (Compl. ¶ 126.) The complaint alleges that at or near the time of Power Edge's default in December 2007, BJ Energy and other unidentified defendants executed trades that increased the losses incurred by the Power Edge portfolio. (Compl. ¶¶ 129-31.)

*FERC Proceedings.*[3]    In January 2008, and as a result of Power Edge's default, PJM attempted to change its rules so that Power Edge's affiliates (the other defendants here) would be responsible for Power Edge's default. (Lomuscio Decl. Ex. C at 22.)  On January 18, 2008, PJM asked FERC to approve changes to the default allocation rule in the Operating Agreement that would permit PJM to force a member to offset the default of an affiliate.  (Lomuscio Decl. Ex. C at 22.)  PJM's proposed change was specifically intended to apply to Power Edge's default.  (Lomuscio Decl. Ex. C at 22 ("Through the proposed rule change, Power Edge affiliates, rather than the other PJM Members, would be responsible for much of the liability arising from Power Edge's default."); Lomuscio Decl. Ex. D at 17 ("PJM states in its filing that it intends to apply the proposal to recover losses previously incurred by the Tower Companies in PJM's markets since May 2007.").)  In other words, PJM asked its regulator to approve a rule change that would make the defendants in this action — instead of all PJM members, pursuant to § 15.2 of the Operating Agreement — responsible for the losing trades made by Power Edge.  The request was made specifically to change the otherwise applicable PJM rules that do not require one company to cover the losses of an affiliate.

---

[3]    PJM conspicuously omits from its complaint any reference to its efforts to amend its default allocation rule in response to Power Edge's default.  This Court, however, can take judicial notice of filings with and decisions by administrative agencies on a motion to dismiss under Rule 12(b)(6).  *See Furnari* v. *Warden, Allenwood Fed. Correctional Inst.*, 218 F.3d 250, 256 (3d Cir. 2000); *Crossroads Cogeneration Corp.* v. *Orange & Rockland Utils., Inc.*, 969 F. Supp. 907, 915-16 (D.N.J. 1997).  The FERC decision and filings referenced in this Motion to Dismiss are attached as exhibits to the Lomuscio Declaration.

On March 25, 2008, FERC rejected PJM's proposal to require defendants to take responsibility for Power Edge's bad trades, concluding that PJM's proposed rule change is not "just and reasonable." (Lomuscio Decl. Ex. D at 19.)  In its order, FERC confirmed that PJM should continue to follow the fundamental legal principle that a legal entity is not liable for the debts of a separate, though affiliated, legal entity. (Lomuscio Decl. Ex. D at 18 n.20.)  FERC emphasized that "[c]ompanies have legitimate, non-manipulative reasons to establish affiliates, and we do not find it just and reasonable for PJM as a generic matter to impose a [] provision that automatically takes the profits of one affiliate to offset against the losses of another separate corporate entity." (Lomuscio Decl. Ex. D at 18.)

It should also be noted that FERC initiated an investigation into defendants' trading in January of this year. (Lomuscio Decl. Ex. D at 17-18.)  In addition, on March 7, 2008, PJM initiated an action before FERC and against defendants. (Lomuscio Decl. Ex. E.) PJM's FERC action mirrors this lawsuit; it involves the same parties and the same fundamental allegations. (Lomuscio Decl. Ex. E.)  But the claim in PJM's FERC action was brought under the Federal Power Act (16 U.S.C. § 824v *et seq.*).  There is no private right of action under the Federal Power Act, 16 U.S.C. § 824v(b); as a result, PJM has improperly attempted to recast the spurious allegations in its FERC action as RICO claims in this action.[4]

*The Complaint.*  On April 16, 2008, PJM filed this lawsuit claiming that separate trading by affiliates constituted a violation of both RICO and Delaware state law.

---

[4]    On April 30, 2008, FERC ordered PJM's FERC action to be held in abeyance pending the FERC's findings in the investigation into defendants' trading. *See* 123 FERC ¶ 61,103, Docket No. EL08-44-000 (April 30, 2008).

(Compl. ¶ 3.)  The complaint alleges that defendants engaged in "a fraudulent scheme to extract money from the energy markets" through the creation of "sham entities" used to pursue "risky investment schemes" that were developed "solely through mathematical modeling."  (Compl. ¶ 1.)  According to the complaint, the alleged scheme involved creating companies "to house each strategy" so that "if one of the strategies does not prevail, the [defendants] simply abandon the losing company or companies, allowing them to default on any obligations they undertook in the market, . . . while simultaneously reaping the profits of the strategies used by the other [companies] they control."  (Compl. ¶¶ 48, 49.)

In attempting to set forth a RICO claim, PJM alleges that defendants participated in "acts of mail fraud" and "acts of wire fraud."  (Compl. ¶¶ 149, 150.)  These acts consist entirely of the following routine business activities:

- Sending Certificates of Incorporation via the mail or electronically to the Secretary of State of Delaware, in 2005, 2006 and 2007, for BJ Energy, GLE Trading, Franklin Power, Power Edge, Ocean Power, Accord Energy and Pillar Fund (Compl. ¶¶ 55, 63, 70, 78, 87, 95, 103.)

- Sending PJM Membership Applications to PJM via the mail or electronically, also in 2005, 2006 or 2007, for BJ Energy, GLE Trading, Franklin Power, Power Edge, Ocean Power, Accord Energy and Pillar Fund (Compl. ¶¶ 59, 66, 73, 81, 90, 98, 106.)

- Sending Customer Account Manager Authorizations to PJM via the mail or electronically, during the same time period and for the same entities.  (Compl. ¶¶ 61, 67, 74, 83, 92, 100, 108.)

- Sending a Power Marketer Application to FERC via the mail or electronically in 2005 for BJ Energy.  (Compl. ¶ 58.)

- Placing bids in PJM's FTR markets and transferring funds to and from PJM electronically.  (Compl. ¶¶ 150, 164.)

- Placing bids in PJM's day-ahead energy market for BJ Energy electronically. (Compl. ¶¶ 150, 164.)

According to the complaint, defendants made misrepresentations by claiming that they were "distinct entities" when allegedly they were not. (Compl. ¶¶ 110-15.) PJM claims — without providing any additional detail — that these alleged misrepresentations were made in reckless disregard for the truth. (Compl. ¶ 113.) This is contradicted by the PJM membership applications attached to the complaint, which make clear that PJM was from the outset aware of the fact that defendants were affiliated with one another because each of the membership applications submitted to PJM by Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge was (a) signed by Mr. Gorton, (b) accurately disclosed that company's relationship to TRC or TRCI as appropriate, and (c) truthfully identified affiliated companies. (*See*, *e.g.*, Compl. Ex. N. ("Affiliate Disclosure" form submitted to PJM by Pillar Fund, signed by Mr. Gorton, listing TRCI as its "Ultimate Corporate Parent," and listing BJ Energy, GLE Trading, Franklin Power, Ocean Power, and Power Edge as "Other Affiliate entities that are PJM members").) There can be no dispute that PJM always knew that each defendant was affiliated with the others. Despite that, PJM has never had a rule in place making affiliates responsible for the trading debts or defaults of another.

## STANDARD ON THIS MOTION

When a plaintiff lacks standing to bring a claim because it cannot allege "injury in fact," a Court should dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. *Maio* v. *Aetna*, 221 F.3d 472, 482 n.7 (3d Cir. 2000) ("Generally speaking, motions to dismiss on the grounds of a failure to allege an 'injury in fact' implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) rather than Rule

12(b)(6)."). Under Rule 12(b)(1), "[t]he plaintiff has the burden of persuasion to convince the court it has jurisdiction." *Gould Elecs., Inc.* v. *United States*, 220 F.3d 169, 178 (3d Cir. 2000). Furthermore, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Mortensen* v. *First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A complaint should be dismissed pursuant to Rule 12(b)(6) if a plaintiff fails to plead sufficient grounds to entitle it to relief. *See Bell Atlantic Corp.* v. *Twombly*, 127 S. Ct. 1955, 1964-65 (2007). "The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips* v. *County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly* at 1965).

When a plaintiff fails to plead a claim of fraud with the particularity required by Rule 9(b), this Court should dismiss the claim under Rule 12(b)(6). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs "must plead with particularity 'the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and

fraudulent behavior.'" *Lum*, 361 F.3d at 223-24 (quoting *Seville Indus. Mach. Corp.* v.

*Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).

   A court should dismiss a claim against a defendant pursuant to Rule 12(b)(5)

when a plaintiff fails to effect valid service of process on that defendant. *Green* v. *Humphrey*

*Elevator & Truck Co.*, 816 F.2d 877, 878 (3d Cir. 1987).

**ARGUMENT**

## I. **PJM LACKS STANDING.**

   For PJM to have standing, it "(1) . . . must have suffered an injury in fact – an

invasion of a legally protected interest which is (a) concrete and particularized and (b) actual

or imminent, not conjectural or hypothetical; (2) there must be a causal connection between

the injury and the conduct complained of — the injury has to be fairly traceable to the

challenged action of the defendant and not the result of the independent action of some third

party not before the court; and (3) it must be likely, as opposed to merely speculative, that the

injury will be redressed by a favorable decision." *Trump Hotels & Casino Resorts, Inc.* v.

*Mirage Resorts Inc.*, 140 F.3d 478, 484-85 (3d Cir. 1998) (citing *Lujan* v. *Defenders of*

*Wildlife*, 504 U.S. 555, 560-61 (1992)). PJM's complaint fails to plead facts sufficient to

show that defendants caused it to suffer an injury, and the documents incorporated by

reference into the complaint demonstrate that PJM lacks standing.

   As shown above, PJM does not bear any financial responsibility for Power

Edge's default. *See* p. 6, *supra.* Instead, under PJM's Operating Agreement, PJM can assess

a "Default Allocation Assessment" against all other members. (Lomuscio Decl. Ex. A §

15.2.)

-13-

Here, PJM has suffered no "injury in fact" because it bears no responsibility for Power Edge's default. To the extent there are any costs incurred as a result of a default, through a Default Allocation Assessment or otherwise, those costs are incurred by PJM's members.[5] (Lomuscio Decl. Ex. A § 15.2 (providing that PJM can collect from members "an amount equal to the amount that the defaulting Member has failed to pay").) PJM is simply the administrator for the distribution of the losses resulting from a default. (Lomuscio Decl. Ex. A § 15.2.) In fact, PJM's counsel stated in March 2008 (in a memorandum PJM posted on its website) in connection with an analysis of credit risk resulting from PJM members in bankruptcy that "PJM's operating structure involves a form of 'cloud' liability in which credit exposure flows through PJM to each Member in the cloud." (Lomuscio Decl. Ex. H at 9.) Because all injuries resulting from a default are borne by members, PJM lacks any "legally protected interest" that has been harmed and has no standing to bring this action on behalf of itself or its members. *See Public Interest Research Group* v. *Magnesium Elektron*, 123 F.3d 111, 119 (3d Cir. 1997) (holding organization has standing only if it shows an "injury in fact, an invasion of a legally protected interest which is concrete and particularized and actual or imminent").

## II.    PJM FAILS TO PLEAD A RICO CLAIM.

RICO provides a civil remedy for certain criminal conduct. *See Genty* v. *RTC*, 937 F.2d 899, 915 (3d Cir. 1991) (affirming dismissal of RICO claims "because the

---

[5]    To the extent that a Member of PJM pays such an assessment, such Member — but not PJM itself — "shall have an independent right to seek and obtain payment and recovery from the Defaulting Member of the amount of the assessment the Member paid. . . ." (Lomuscio Decl. Ex. A § 15.2.) *See* p. 6 n. 2, *supra*.

predicate criminal offenses under the statute's definition of 'racketeering' are wholly absent"). Courts carefully monitor RICO claims in order to prevent a plaintiff from misusing RICO. *See Mathews* v. *Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3d Cir. 1998). Indeed, "[b]ecause of the opprobrium that a RICO claim brings to a defendant, . . . courts should eliminate frivolous RICO claims at the earliest stage of litigation." *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700, at *7 (D.N.J. Sept. 28, 2007) (quoting *Durant* v. *ServiceMaster Co.*, 159 F. Supp. 2d 977, 981 (E.D. Mich. 2001)). When, as here, a RICO complaint contains "nothing more than the [most] conclusory of allegations and the repetitious use of RICO catchwords," a court should dismiss it on the pleadings. *Alexander* v. *Jenkins*, 1990 WL 98960, at *5 (E.D. Pa. July 13, 1990).

PJM asserts that defendants violated sections 1962(c) and 1962(d) of RICO. (Compl. ¶¶ 141-54,155-69.) In order to state a claim under these sections, PJM must plead facts sufficient to show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 496 (1985). RICO defines "racketeering activity" as participation in any of the predicate crimes listed in 18 U.S.C. § 1961(1), and requires a "pattern" of at least two predicate crimes within a period of ten years. *See* 18 U.S.C. § 1962(c).

The only predicate acts alleged here by PJM are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. To establish a violation of those statutes, a plaintiff must plead facts sufficient to show: (i) a scheme or artifice to defraud, (ii) participation by the defendants with the specific intent to defraud and (iii) use of the mail or wires in furtherance

of the scheme. No such scheme to defraud is set forth in the complaint, and none could be under the facts of record.

## A.    **PJM Fails to Plead Predicate Acts.**

The "fraudulent scheme" alleged by PJM is premised on completely lawful conduct. Stripped of hyperbole, PJM alleges that between April 2005 and December 2007 defendants committed wire and mail fraud by (a) sending Certificates of Incorporation to the Delaware Secretary of State (Compl. ¶¶ 55, 63, 70, 78, 87, 95, 103); (b) sending a Power Marketer Application to FERC (Compl. ¶ 58); (c) submitting PJM membership applications and customer account manager authorizations to PJM (Compl. ¶¶ 59, 61, 66, 67, 73, 74, 81, 83, 90, 92, 98, 100, 106, 108); and (d) sending bids to PJM (Compl. ¶¶ 150, 164). While PJM alleges that Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge are "sham corporation[s] set up . . . to house extremely risky investments" (Compl. ¶ 112), it does not allege that these defendants were ineligible for membership in PJM or that they violated PJM's trading rules. (Compl. ¶¶ 141-54, 155-69.) Indeed, PJM accepted these defendants as members with full knowledge of their affiliations. (Compl. Exs. A-O.) It then permitted each entity to trade for its own account.

PJM's allegation that it is fraudulent for one company to do what PJM permitted — to trade on its own account — is not only illogical, it is contradicted by PJM's own rules and the March 25, 2008 FERC ruling. The Tariff and Operating Agreement approved by FERC permitted affiliated companies to become members and trade in PJM's markets. (Lomuscio Decl. Ex. A §§ 1.2, 11.6, Ex. B § 1.0A.01.) No rule ever required one member to cover losses resulting from trades by an affiliate. When PJM asked FERC to

-16-

approve a rule that would do so — a rule expressly intended to cover these defendants —
FERC rejected that proposal. (Lomuscio Decl. Ex. D at 18.) FERC specifically ruled just
three weeks before PJM filed this meritless action that "affiliated companies may acquire
portfolios with differing risk characteristics commensurate with the risk profiles of their
respective investors. For PJM automatically to offset earnings for one affiliate to cover the
default of another would preclude investors from taking positions that reflect their level of
risk tolerance." (Lomuscio Decl. Ex. D at 18.) As a result, there can be no viable RICO
claim based on an allegation that defendants engaged in activity specifically permitted by
PJM's rules. *See Doug Grant, Inc.* v. *Greate Bay Casino Corp.*, 232 F.3d 173, 188-89 (3d
Cir. 2000), where the Third Circuit dismissed plaintiffs' claim that a casino participated in a
RICO predicate act by violating a rule promulgated by the New Jersey Casino Control
Commission as "completely insubstantial and border[ing] on the frivolous" because the rule
"itself makes clear that a casino at its discretion may shuffle at the conclusion of any round
of play." *Id.* at 184, 187. The same reasoning requires dismissal of PJM's RICO claims.

        In fact, courts uniformly hold that a RICO claim will not stand absent
sufficient allegations of fraud. For example, in *Kehr Packages, Inc.* v. *Fidelcor, Inc.*, 926
F.2d 1406, 1417 (3d Cir. 1991), the Third Circuit held that plaintiff failed to state a RICO
claim because "the allegations against [defendant] simply contain no indication of the
deception or overreaching which the mail fraud statute requires." Similarly, in *Genty,* 937
F.2d at 915, the Third Circuit held that plaintiff failed to state a RICO claim because it failed
to allege fraudulent acts, and the Court expressed "wonder[ment] [at] how the orchestration
of an attempt to drain and clean up the discolored lake could constitute a criminal offense."

*Reynolds* v. *East Dyer Dev. Co.*, 882 F.2d 1249, 1251 (7th Cir. 1989) is to the same effect; there, the Seventh Circuit held that the plaintiffs failed to state a RICO claim based on fraud because they "have not alleged or shown that the defendants lied to them – or anybody else." Finally, *Midwest Grinding Co.* v. *Spitz*, 976 F.2d 1016 (7th Cir. 1992) is also right on point. The Seventh Circuit there observed that "civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." 976 F.2d at 1025. PJM's claims are even more deficient.

Indeed, labeling as a "scheme" a pattern of otherwise lawful activities such as the formation of legal entities pursuant to Delaware law and trading in PJM's markets (Compl. ¶¶ 8, 46-47, 55, 63, 70, 87, 95, 103, 149, 150) does not make out the necessary elements under the mail and wire fraud statutes. "Although a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation." *Spencer Bank, S.L.A.* v. *Seidman*, 528 F. Supp. 2d 494, 498 (D.N.J. 2008) (citing *Doug Grant, Inc.*, 232 F.3d at 183-84). PJM must "state clearly how these or any other communications were false or misleading, or how they contributed to the alleged fraudulent scheme." *Warden* v. *McLelland*, 288 F.3d 105, 114 (3d Cir. 2002). PJM fails to plead sufficient facts indicating how any of defendants' allegedly fraudulent communications during the period from April 2005 to December 2007 were false and misleading or how defendants' trading was part of some unlawful "scheme." (Compl. ¶¶ 8, 46-47, 55, 63, 70, 87, 95, 103, 149, 150.)

Finally, PJM's allegation that defendants participated in mail and wire fraud by creating "sham corporation[s] set up . . . to house extremely risky investments" (Compl. ¶ 112), also fails to plead a scheme to defraud necessary to allege RICO predicate acts. PJM's FERC-approved rules permit affiliated members like the defendants to trade on PJM's markets. (Lomuscio Decl. Ex. A § 1.2, Ex. B § 1.0A.01.) The membership applications and Customer Account Manager Authorizations attached as Exhibits A to O of the complaint demonstrate that PJM expressly permitted each of Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge to become PJM members and trade FTRs, knowing that they were affiliated not only with each other, but also with Mr. Gorton, TRC and TRCI. (Compl. Exs. A-O.)

Moreover, PJM sought a rule change which would have made these defendants responsible for Power Edge's bad trades. (Lomuscio Decl. Ex. C at 1, 19.) In March 2008, FERC rejected that proposal, finding "it is not just and reasonable to adopt a provision that will address only a subset of the entities likely to face the credit risks presented, and that discriminates against certain companies based on their corporate form." (Lomuscio Decl. Ex. D at 19.) This ruling, made just weeks before PJM filed this action, makes clear that it is perfectly proper — i.e., a "legitimate, non-manipulative" business practice — for separate legal entities to trade for their own account, independent of their affiliates. (Lomuscio Decl. Ex. D at 19.)

More fundamentally, risky trades are not fraudulent and do not violate RICO. Not surprisingly, PJM fails to allege that making "extremely risky investments" violates any PJM or FERC rules or is in any way fraudulent or improper. (Compl. ¶ 112.) That is

because no such rule exists. Furthermore, in its March 25, 2008 order, FERC explicitly recognized that PJM here permitted "risky counterflow positions in its auctions" even though it "is under no obligation" to do so. (Lomuscio Decl. Ex. D at 19 n.21.)

Power Edge's default, especially when the possibility of default is contemplated in PJM's default allocation rule, is nothing more than "a simple breach of contract . . . [that] is not a predicate act of racketeering activity." *Annulli* v. *Panikkar*, 200 F.3d 189, 199 (3d Cir. 1999). *Cf. Brokerage Concepts, Inc.* v. *U.S. Healthcare, Inc.*, 140 F.3d 494, 529 (3d Cir. 1998) (even "heavy-handed business tactics, . . . while relevant to a tortious interference claim, cannot be made to fit within the statutory and doctrinal constraints of the mail and wire fraud statutes."); *Blount Financial Services, Inc.* v. *Walter E. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987) (holding that absent specific allegations of intentional fraud, "sending a financial statement which misconstrues the prime rate provided by the terms of the contract may breach the contract but it does not amount to a RICO mail fraud cause of action.")

### B.    PJM Fails to Plead RICO Injury.

Because PJM fails to allege sufficient predicate acts, PJM has not alleged any RICO injury, and this Court should dismiss PJM's RICO claims. Under 18 U.S.C. 1964(c), only a "person injured in his business or property by reason of a violation of [RICO] may sue." Thus, "[i]n order to recover under [RICO] a plaintiff must plead . . . [a predicate act and] an injury to business or property by reason of [the RICO] violation." *Lightning Lube, Inc.* v. *Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993) (citing *Shearin* v. *E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1164 (3d Cir. 1989)). In other words, a plaintiff must plead that "the

defendant's [predicate act] not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes* v. *Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Anderson* v. *Ayling*, 396 F.3d 265, 269 (3d Cir. 2005). As discussed above, PJM does not sufficiently plead injury to itself or any predicate acts and therefore cannot plead any RICO injury. *See Doug Grant, Inc.*, 232 F.3d at 187 ("[I]nasmuch as appellants have failed to allege any predicate act upon which to base a RICO claim, we need not determine conclusively whether appellants properly have pleaded injury to business or property as required for a RICO damages action.").

## III.    PLAINTIFF FAILS TO PLEAD MAIL AND WIRE FRAUD WITH PARTICULARITY.

PJM's conclusory statements in the complaint regarding defendants' allegedly fraudulent conduct fail to satisfy Rule 9(b)'s strict pleading requirements. The Third Circuit has held that Rule 9(b) requires a plaintiff to plead "the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Lum*, 361 F.3d at 224 (quoting *Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). "[W]hen alleging mail and wire fraud as predicate acts in a RICO claim, plaintiff's pleadings must identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentations." *Annulli*, 200 F.3d at 201 n.10. PJM identifies no such statements here and fails to meet the exacting standards of Rule 9(b).

PJM's allegations regarding defendants' alleged "misrepresentations" are contained in six paragraphs of the complaint. (Compl. ¶¶ 110-15.) Not once does PJM claim

-21-

that these statements were fraudulent. Instead, PJM attempts to confuse the issue by implying that it was not somehow aware that Mr. Gorton, TRC or TRCI were related to the other defendants. For example, PJM alleges that "[a]t the time [Mr.] Gorton and [TRC and TRCI] represented to the Secretary of State for the State of Delaware and to PJM that the [other defendants] were distinct entities, they actually knew that the [other defendants] were, in fact, sham corporations, and that they had been established to further [Mr.] Gorton and [TRC and TRCI's] scheme to manipulate PJM's markets, or they made such statements with reckless disregard for the truth despite their knowledge and understanding of the purpose of the [other defendants]." (Compl. ¶ 113.)

PJM's wholly conclusory allegations fail to identify any false statements, misrepresentations, or fraudulent omissions in any of the materials provided by defendants to the Delaware Secretary of State, FERC, PJM or any other energy market. Likewise, the complaint does not identify any false statements, misrepresentations or fraudulent omissions in the bids defendants sent to PJM or to other energy markets. It does nothing more than make conclusory and unsupported allegations that defendants are "sham" entities and that their routine business communications are fraudulent. This type of circular pleading manifestly lacks the particularity required by Rule 9(b). *See Temple* v. *Haft*, 73 F.R.D. 49, 54 (D. Del. 1976) (holding allegations of fraudulent scheme "exhaustive of the entire existence" of company "and all of its endeavors . . . do not satisfy the particularity requirement of Rule 9(b)").

## IV.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER PJM'S STATE LAW CLAIMS.

Once the RICO claims are dismissed, the additional claims — all asserted under Delaware law — should also be dismissed, as no independent basis for federal jurisdiction exists over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that district courts should decline to exercise supplemental jurisdiction over a claim where "the district court has dismissed all claims over which it has original jurisdiction."). Diversity jurisdiction does not exist because plaintiff PJM and defendants TRCI, Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge are all Delaware companies. (Compl. ¶¶ 4, 8.)

Moreover, in the interests of efficiency, fairness and comity, this Court should decline to adjudicate the pendent state claims. *See Hedges* v. *Musco*, 204 F.3d 109, 123 (3d Cir. 2000). Courts will generally only maintain jurisdiction over pendent claims in extraordinary circumstances, such as when the litigation has progressed for years, there has been expansive discovery and a trial date is imminent. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 455-56 (5th Cir. 1998). This case represents the exact opposite of the spectrum — it is in its very initial stages, there has been no discovery and the action was just recently filed. This Court should therefore decline to exercise pendent jurisdiction over the Delaware state law claims.

## V.    PJM DID NOT PROPERLY SERVE TRC OR MR. GORTON.

PJM's service of process on TRC was ineffective. TRC is a New York limited liability company. PJM attempted to serve TRC by serving the Delaware Secretary of State. (Lomuscio Decl. Ex. F.) TRC, however, is not registered to do business in

Delaware and has no registered agent for service of process in Delaware. To the extent PJM purported to serve TRC as a "manager" of one of the other defendants, which are Delaware companies, it was required to do so by serving TRC through one of these defendants' agent for service of process, CT Corporation, and not the Delaware Secretary of State. *See* 6 *Del. C.* § 18-109(b) (service on non-Delaware manager of a Delaware limited liability company "shall be effected by serving the registered agent" if there is one).

PJM's service of process on Mr. Gorton was also ineffective. Mr. Gorton is a citizen of New York. PJM attempted to serve Mr. Gorton by serving the Delaware registered agent of Lime Group. (Lomuscio Decl. Ex. G.) Mr. Gorton can be served as a "manager" of Lime Group only in proceedings "involving or relating to the business of" Lime Group. 6 *Del. C.* § 18-109(a). Because Lime Group is not a defendant in this action, service on Mr. Gorton was ineffective. 6 *Del. C.* § 18-109(a).

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' motion to dismiss the complaint in its entirety.

Dated: May 7, 2008

OF COUNSEL:

David B. Tulchin
Richard J.L. Lomuscio
Brian L. Frye
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Jesse A. Finkelstein (#1090)
Daniel A. Dreisbach (#2583)
Steven J. Fineman (#4025)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
dreisbach@rlf.com
fineman@rlf.com

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2008, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

> **BY HAND DELIVERY**
> Collins J. Seitz, Jr., Esquire
> Max B. Walton, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> 8th Floor
> P.O. Box 2207
> Wilmington, DE 19899

I hereby certify that on May 7, 2008, I have sent by Federal Express, the foregoing

document to the following non-registered participant:

> **BY FEDERAL EXPRESS**
> Eric N. Macey, Esquire
> Novack & Macey LLP
> 100 North Riverside Plaza
> Chicago, IL 60606-1501

> Steven J. Fineman (#4025)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> fineman@rlf.com