## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PJM INTERCONNECTION, LLC, directly and derivatively on behalf of Power Edge, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION |
| MARK GORTON, TOWER RESEARCH CAPITAL LLC, TOWER RESEARCH CAPITAL INVESTMENTS, LLC, ACCORD ENERGY, LLC, BJ ENERGY, LLC, FRANKLIN POWER, LLC, GLE TRADING, LLC, OCEAN POWER, LLC, PILLAR FUND, LLC, and POWER EDGE LLC, | ) ) ) ) ) ) ) ) ) | No.: 1:08-cv-00216-JJF |
| Defendants. | ) | |

## PJM INTERCONNECTION LLC'S
## RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Eric N. Macey
Richard G. Douglass
Molly S. DiRago
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
Tel: 312-419-6900
Fax: 312-419-6928

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street, 8th Floor
P.O. Box 2207
Wilmington, DE 19899
Tel: 302-658-9141
Fax: 302-656-0116

*Attorneys for Plaintiff PJM Interconnection, LLC*

Dated: June 3, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ii

NATURE AND STAGE OF PROCEEDINGS .............................................................1

SUMMARY OF ARGUMENT .....................................................................................1

STATEMENT ...............................................................................................................2

ARGUMENT ..............................................................................................................12

    I.    STANDING ....................................................................................................12

        A.    Defendants Apply The Wrong Standard.................................................12

        B.    PJM Suffered An Injury-In-Fact............................................................13

    II.    PJM HAS SUFFICIENTLY PLEADED A RICO CLAIM ................................16

        A.    PJM Has Sufficiently Pleaded A Scheme
             To Defraud and Predicate Acts ...............................................................16

            i.    Appropriate Standard.................................................................16

            ii.    A Scheme to Defraud Can Include Elements Of
                  Lawful Conduct.........................................................................17

            iii.    The Predicate Acts Can Include Elements of
                 Lawful Conduct.........................................................................19

        B.    PJM Has Sufficiently Pleaded Injury .......................................................23

            i.    The Court Must Accept The Allegations
               Regarding Injury As True ..........................................................23

            ii.    PJM Has Sufficiently Pleaded Injury ............................................24

    III.    PJM'S COMPLAINT SATISFIES RULE 9(b) ...................................................25

    IV.    THE COURT HAS JURISDICTION OVER PJM'S STATE LAW CLAIMS ...28

    V.    ANY SERVICE DEFECTS HAVE BEEN CURED ...........................................28

CONCLUSON ...........................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                <u>Page</u>

<u>Anderson v. Ayling</u>, 396 F.3d 265 (3rd Cir. 2005) ........................................................................24

<u>Annulli v. Panikkar</u>, 200 F.3d 189 (3rd Cir. 1999)........................................................................21

<u>Bell Atlantic Corp. v. Twombly</u>, -- US --, 127 S. Ct. 1955 (2007)..............................................16

<u>Borden v. Sinskey</u>, 530 F.2d 478 (3rd Cir. 1976)........................................................................15

<u>Breyer v. Meissner</u>, 214 F.3d 416 (3rd Cir. 2000) ......................................................................16

<u>Craftmatic Securities Litigation v. Kraftsow</u>, 890 F.2d 628 (3rd Cir. 1989) ........................25, 27

<u>Danvers Motor Co. v. Ford Motor Co.</u>, 432 F.3d 286 (3rd Cir. 2005) ..............................12, 13, 23

<u>Doug Grant, Inc. v. Greate Bay Casino Corp.</u>, 232 F.3d 173 (3rd Cir. 2000)..............................20

<u>Durland v. U.S.</u>, 161 U.S. 306 (1896) .....................................................................................17, 18

<u>Household International, Inc. v. Westchester Fire Insurance Co.</u>,
    286 F. Supp. 2d 369 (D. Del. 2003)...............................................................................25, 26

<u>Genty v. Resolution Trust Group</u>, 937 F.2d 899 (3rd Cir. 1991) ............................................20, 21

<u>Kehr Packages v. Fidelcor, Inc.</u>, 926 F.2d 1406 (3rd Cir. 1991).....................................................21

<u>Lexington Insurance Co. v. Forrest</u>, 263 F. Supp. 2d 986 (E.D. Pa. 2003) .............................13, 23

<u>Maio v. Aetna, Inc.</u>, 221 F.3d 472 (3rd Cir. 2000) ..................................................................23, 24

<u>Mariana v. Fisher</u>, 338 F.3d 189 (3rd Cir. 2003).................................................................12, 13, 23

<u>In re Midlantic Corp. Shareholder Litigation</u>, 758 F. Supp. 226 (D.N.J. 1990) ......................25, 27

<u>Midwest Grinding Co. v. Spitz</u>, 976 F.2d 1016 (7th Cir. 1992) ...............................................22, 23

<u>Mortensen v. First Fed. Savings & Loan Association</u>,
    549 F.2d 884 (3rd Cir. 1977) ...............................................................................................12, 13

<u>Nielsen Electronics Institute v. Student Finance Corp.</u>,
    No. Civ. A. 99-285-JJF, 2001 WL 34367324 (D. Del. Jan. 16, 2001)................16, 17, 19

<u>Phillips v. County of Allegheny</u>, 515 F.3d 224 (3rd Cir. 2008).....................................................16

Public Interest Research Group v. Magnesium Elektron,
    123 F.3d 111 (3rd Cir. 1997) ............................................................................. 14

Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266 (3rd Cir. 2001) ............................. 28

Resource Ventures, Inc. v. Resource Management International, Inc.,
    42 F. Supp. 2d 423 (D. Del. 1999) ..................................................................... 25

Reynolds v. East Dyer Development Co., 882 F.2d 1249 (7th Cir. 1989) .......... ..................22

Saporito v. Combustion Eng'g, Inc., No. 86-1998,
    1988 WL 142406 (D.N.J. Dec. 5, 1988) .............................................................. 25

Schmuck v. U.S., 489 U.S. 705 (1989) .......................................................... ....19, 20

Storino v. Borough of Point Pleasant Beach,
    322 F.3d 293 (3rd Cir. 2003) ...................................................................12, 13, 23

Temple v. Haft, 73 F.R.D. 49 (D. Del. 1976) ..........................................................25, 27

Township of Marlboro v. Scannapieco,
    --- F. Supp. 2d ---, No. 07-4988 (JAP), 2008 WL 1820897 (D.N.J. Apr. 23, 2008) ........24

U.S. v. Adamo, 534 F.2d 31 (3rd Cir. 1976) ............................................................. 19

U.S. v. Hevener, 382 F. Supp. 2d 719 (E.D. Pa. 2005) .............................................. 19

U.S. v. Maze, 414 U.S. 395 (1974) ......................................................................... 19

U.S. v. Pearlstein, 576 F.2d 531 (3rd Cir. 1978) ...................................................... 17

U.S. v. Shively, 927 F.2d 804 (5th Cir. 1991) ........................................................... 19

## Statutes                                                                          Page

18 USC § 1964(a) & (c) ....................................................................................... 14

28 USC § 1367 ............................................................................................... 2, 28

6 Del. C § 1307 .................................................................................................. 15

## Rules                                                                             Page

Fed. R. Civ. P. 9(b) .......................................................................................... 2, 29

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 29

Fed. R. Civ. P. 12(b)(5) ............................................................................................................29

Fed. R. Civ. P. 12(b)(6) ............................................................................................................29

## NATURE AND STAGE OF PROCEEDINGS

PJM Interconnection, LLC ("PJM") initiated suit against defendants Mark Gorton ("Gorton"), Tower Research Capital LLC ("TRC"), Tower Research Capital Investments LLC ("TRCI"), Accord Energy LLC, BJ Energy LLC, Franklin Power LLC, GLE Trading LLC, Ocean Power LLC, Pillar Fund LLC and Power Edge LLC on April 16, 2008, pursuant to 28 U.S.C. § 1331, alleging violations of Sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, fraudulent transfer and breach of contract. Additionally, PJM seeks to have the Court pierce the corporate veil of defendant Gorton's sham entities. Defendants moved to dismiss this case on May 7, 2008, and the parties stipulated that PJM would respond to defendants' Motion on or before June 3, 2008 and defendants could reply by June 17, 2008.

## SUMMARY OF ARGUMENT

Defendants move to dismiss PJM's Complaint for four reasons, none of which is legally or factually sound. Specifically, defendants claim that PJM: (1) lacks standing to assert a RICO claim against defendants; (2) fails to adequately plead a RICO claim; (3) fails to allege mail or wire fraud with particularity under Fed. R. Civ. Pro. 9(b); and (4) failed to properly serve two defendants -- TRC and Gorton. Additionally, defendants request that the Court decline to exercise supplemental jurisdiction over PJM's state law claims. Each of these arguments fails for the following reasons:

1. **Standing:** PJM has standing to pursue a RICO claim because it suffered injury-in-fact: the loss of tens of millions of dollars. Indeed, direct monetary harm is the classic form of injury-in-fact. Further, defendants apply the wrong legal standard to this issue. Defendants claim that the allegations in PJM's Complaint should

not be accepted as true, but the Third Circuit has held otherwise, stating that when reviewing a facial attack on standing, courts must accept as true all material allegations of the complaint and construe them in favor of Plaintiff.

2.   **RICO Claim:**  PJM has pleaded the predicate acts of mail and wire fraud and the existence of a scheme to defraud in exhaustive detail.  Defendants are wrong that a scheme to defraud cannot include acts that could be lawful conduct and that the scheme must be fraudulent on its face.

3.   **Rule 9(b) Pleading Requirements:**  PJM's Complaint satisfies Rule 9(b) because it has alleged numerous predicate acts of mail and wire fraud with specificity and further explains and describes defendants' scheme to defraud, how the mailings and wire transmissions furthered that scheme, and the purpose of the scheme.

4.   **Service Issues:**  This issue is now moot as PJM has correctly and sufficiently served both Gorton and TRC.

5.   **Supplemental Jurisdiction:**  Because there are no appropriate bases on which to dismiss PJM's Complaint, the Court has original jurisdiction over PJM's state law claims pursuant to 28 U.S.C. § 1367(a).

## STATEMENT OF FACTS

### The Parties

Plaintiff PJM is a Delaware limited liability company with its principal place of business in Norristown, Pennsylvania.  (D.I. 1, ¶ 4.)  PJM is the regional transmission organization ("RTO") that operates the bulk energy transmission system for all, or portions of, Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia.  (Id.)  The

energy lines, transformers, substations and related facilities under PJM's control are referred to herein as the "Grid." Additionally, PJM operates several related markets: a day-ahead energy market, a real-time energy market, markets for ancillary services, and markets for the sale and purchase of financial rights and obligations, including markets for what are known as a financial transmission rights or "FTRs." (Id.)

Defendant Mark Gorton owns the Lime Group, a conglomerate of several high-tech business entities headquartered in New York, New York. (Id., ¶ 5.) Among other things, Gorton and the Lime Group own defendants TRC and TRCI (collectively, the "Tower Companies"). (Id.) Gorton is also the founder of all of the other corporate defendants: Accord, BJ Energy, Franklin Power, GLE Trading, Ocean Power, Pillar Fund and Power Edge (collectively, the "Trading Companies"). (Id., ¶ 6.) Gorton, directly and through the Tower Companies, has managed the Trading Companies since their inception. (Id.)

The Tower Companies are Delaware limited liability companies of which Gorton is the managing member. (Id., ¶¶ 7, 10.) They are hedge funds that engage in technically sophisticated trading and investing on the basis of quantitative, statistical and mathematical modeling. (Id., ¶ 7.) Using this strategy, the Tower Companies purportedly attempt to identify patterns in various markets, and have engaged in extremely risky investments in an effort to exploit those patterns for profit. (Id.)

Just like the Tower Companies, the Trading Companies are all Delaware limited liability companies of which Gorton is the Managing Director. (Id., ¶¶ 8, 10.) They were formed by Gorton and the Tower Companies to separately house the extremely risky investment strategies developed by the Tower Companies as part of their overall trading scheme. (Id., ¶ 8.) That is, they are part of one whole trading strategy coordinated and controlled by Gorton and the Tower

3

Companies. (Id.) Contrary to the suggestion by defendants in the Motion, they are not merely related affiliates; they are all sham entities under common ownership and control, set up in a deliberate effort to shield the rest of the enterprise's assets should any of the extremely risky mathematical trading strategies housed by a Trading Company fail -- as happened in this case. (Id.) By knowingly abusing the corporate form, Gorton and the Tower Companies could allow the failing Trading Company to default on its obligations and shelter the remainder of Gorton's and the Tower Companies' investments in the other Trading Companies. (Id.) All of the Trading Companies participate in PJM's markets. (Id., ¶ 13.)

**The PJM Energy Markets**

In order to better appreciate defendants' scheme to exploit and defraud PJM's markets, one must first understand those markets. Generally, energy is bought and sold in energy markets. (Id., ¶ 23.) PJM operates a centralized energy marketplace and administers two energy markets for buyers and sellers of energy: (a) the day-ahead energy market; and (b) the real-time energy market. (Id.) The day-ahead market allows energy buyers and sellers to lock in the prices for the energy that they will deliver or use the following day. (Id., ¶ 25.) It is a forward market, where prices are calculated for each hour of the next operating day, and cleared (or settled) by PJM. (Id.) The real-time energy market is a spot market. (Id., ¶ 26.) It is generally used by load serving entities (such as the typical public utility) either: (a) to purchase energy when a participant has greater load (i.e., demand) to serve than was expected the day before (and thus bought too little generation in the day-ahead market); or (b) to sell energy when the participant has less load to serve than was expected the day before (and thus purchased more generation than was actually necessary). (Id.)

Generally, PJM operates the energy markets in a manner that allows participants to obtain energy at the lowest possible price based on the bids PJM receives, regardless of their location on the Grid. (Id., ¶ 28.) That is because, in theory, the Grid allows energy generated anywhere on the Grid to be consumed anywhere on the Grid. (Id.) In reality, however, certain limitations of the transmission equipment, such as transmission lines, substations and transformers, restrict how much energy can flow across the Grid, and the directions in which it can flow. (Id., ¶ 29.) Such limitations are called "transmission constraints." (Id.) Sometimes, due to transmission constraints, PJM may determine that the energy needed to serve a particular demand cannot be supplied by the lowest-bidding generator because the energy cannot get from the generator to the demand without overloading or compromising the stability of the Grid. (Id., ¶ 30.) The increased cost to serve that demand is called a "congestion cost." (Id., ¶ 31.)

Congestion costs can impact the price of energy. Accordingly, some market participants may wish to hedge against the risk of congestion by obtaining Financial Transmission Rights ("FTRs") in PJM's FTR market. (Id., ¶ 34.) Generally, the holder of an FTR has the right to receive a credit or debit based on the amount of congestion costs along a specific transmission pathway during a specific time. (Id., ¶ 36.) There are two types of FTRs available. (Id., ¶ 38.) The typical FTR is commonly known as a "prevailing flow FTR," or simply an FTR. (Id.) The other type of FTR is commonly known as a "counterflow FTR." (Id.)

There are also generally two types of participants in PJM's FTR auctions: (a) load-serving entities (like electric utilities) that buy and sell FTRs to offset or hedge against anticipated actual congestion costs associated with power delivery; and (b) participants, like the Trading Companies, that use the auction solely for investment or trading purposes, decoupled from any obligation to deliver actual energy to consumers. (Id., ¶ 39.)

5

For FTR traders, like the Trading Companies, the purchase of a prevailing flow FTR is a bet that actual congestion costs will be higher than expected congestion costs over the specified transmission pathway during the period of the FTR. (Id., ¶ 40.) As congestion on a pathway increases, the payoff to the owner of an FTR on that pathway increases. (Id., ¶ 41.) Conversely, for FTR traders, the purchase of a counterflow FTR is a bet that there will be lower than expected congestion costs over the specified transmission pathway during the period of the FTR. (Id., ¶ 42.) Thus, if actual congestion costs are lower than expected, the holder of the counterflow FTR will profit. (Id.)

### Gorton and the Tower Companies' Scheme

As part of Gorton and the Tower Companies' plan, Power Edge participated in PJM's annual FTR auction for the 2007/2008 period (the "Annual FTR Auction") and several of PJM's monthly FTR auctions in 2007 (the "Monthly FTR Auctions"). (Id., ¶ 116.) Pursuant to the quantitative trading scheme developed for Power Edge by Gorton and the Tower Companies, Power Edge acquired an unusual and astoundingly risky portfolio of primarily "short" counterflow FTR positions. (Id., ¶¶ 117-18.) Worse, Power Edge further exacerbated its risk by acquiring additional counterflow FTR positions directly from another PJM participant. (Id., ¶ 119.)

Moreover, Power Edge took the counterflow FTRs over transmission pathways that were subject to a scheduled outage that would increase congestion, and reduce the likelihood that the counterflow FTRs would pay off. (Id., ¶ 124.) Contrary to the statements in defendants' Motion, this planned outage was announced in February 2007 -- well before Power Edge purchased its counterflow FTRs in April. (Id.) Nevertheless, Gorton and the Tower Companies

6

turned a blind eye to the real world, knowing that it was irrelevant to the success of their scheme. (Id.)

Unlike Power Edge, a reasonable participant in PJM's FTR markets would not typically take on the extremely high risk, out-of-balance portfolio that Power Edge did. (Id., ¶ 120.) They would also purchase prevailing flow FTRs, or take on other positions, that would offset the risk of increased congestion. (Id.) In fact, the Tower Companies did just that -- but not in Power Edge. (Id., ¶ 121.) Instead, they used several of the other Trading Companies to acquire prevailing flow FTRs in PJM's monthly auction, knowing that, if the counterflow FTR positions in Power Edge did not pay off, they would cause Power Edge to default, and would pass off their obligations to PJM and/or its other participants. (Id.) Meanwhile, they knew they would (and did) reap the benefits of the prevailing flow FTR positions held by the other Trading Companies. (Id.)

All of the FTR positions in all of the Trading Companies were acquired under the direction and control of Gorton, Lee (the Trading Companies' Risk Manager and PJM Customer Account Manager) and the Tower Companies (the Trading Companies managing members). (Id., ¶ 122.) Similarly, the individual trader who purchased the counterflow FTRs for Power Edge, Bing Ni, is the same trader who purchased the prevailing flow FTRs for Accord Energy, BJ Energy and Ocean Power. (Id.)

Power Edge's counterflow FTR positions were a colossal bust. (Id., ¶ 123.) In November, 2007, Power Edge suffered a net loss on its positions in the amount of approximately $2.3 million, and had a cumulative loss of $18.3 million since May, 2007. (Id., ¶ 127.) Pursuant to the PJM Operating Agreement, Power Edge was required to make a payment in the amount of $2.3 million in December, 2007. (Id.) Power Edge refused. (Id.) Instead, Bing Ni told PJM

that Power Edge was going to use the small amount of money it had left for legal expenses to fight its obligations, rather than to make any payments on the bill. (Id.)

## The Tower Companies' Manipulative Energy Bids

Once Power Edge was completely underwater, with no hope of recovery, Gorton and the Tower Companies furthered their scheme by manipulating PJM's markets to benefit the offsetting positions held by the other Trading Companies, at the expense of increasing the defaults of Power Edge. (Id., ¶ 128.) Specifically, beginning in December, 2007, Bing Ni, at the direction of Gorton and the Tower Companies, deliberately began submitting bids in PJM's day-ahead energy market that were intended to, and did, materially increase the congestion along the transmission pathways covered by Power Edge's counterflow FTRs. (Id., ¶ 129.) By increasing congestion costs in this manner, Gorton and the Tower Companies knew that the amount of Power Edge's counterflow FTR obligations, which it would not and could not pay, would thereby increase. (Id.)

But, because it was part of their scheme all along, Gorton and the Tower Companies also knew that some, if not all, of the other Trading Companies, including BJ Energy, had deliberately taken offsetting prevailing flow FTR positions. (Id., ¶ 130.) Therefore, by submitting bids to increase congestion costs, Gorton and the Tower Companies reaped more profits on the prevailing flow FTRs held by those other Trading Companies, while further exacerbating the counterflow FTR losses in the failed Power Edge portfolio. (Id.) Gorton and the Tower Companies, thus, intentionally increased Power Edge's default, knowing that Power Edge would never be able to pay it anyway, at the expense of PJM and its participants, while simultaneously increasing the profits of the other Trading Companies, again, at the expense of PJM and its participants. (Id., ¶ 131.)

8

Moreover, by manipulating these prices, Gorton and the Tower Companies artificially distorted the cost of energy on the Grid for everyone serving load in the locations of the impacted transmission pathways. (Id., ¶ 132.) Based upon its preliminary analysis, PJM estimates that Gorton and the Tower Companies' manipulative trading in the day-ahead energy market increased the price of energy by over $4 million per month in the affected areas in December, 2007 and January, 2008. (Id.)

**Power Edge's Ongoing Defaults**

As a result of transmission costs and transactional activity of the Tower Companies, in December, 2007, Power Edge suffered a net loss of $19.9 million. (Id., ¶ 133.) When this payment came due in January, 2008, Power Edge again defaulted. (Id.) In January, 2008, Power Edge suffered a net loss of $16.0 million. (Id., ¶ 134.) Power Edge again defaulted when this payment came due in February, 2008. (Id.) In February 2008, Power Edge suffered a net loss of $9.4 million. (Id., ¶ 135.) Power Edge defaulted again when this payment came due in March, 2008. (Id.) Thus, through March 2008, as of the time the Complaint was filed, Power Edge had defaulted on approximately $47.6 million in FTR obligations. (Id., ¶ 136.)

In addition, although Power Edge's FTR obligations ran through May 31, 2008, less than a week before this filing, Gorton and the Tower Companies informed PJM that Power Edge will not make any further payment on its obligations to PJM. (Id., ¶ 137.) Thus, as of the date the Complaint was filed, PJM estimated that Power Edge's default would total between $50 million and $60 million. (Id., ¶ 138.)

If Gorton and the Tower Companies had operated their unitary business as a single entity, and not set up sham entities to effect their scheme, then there would be substantially more assets available to satisfy Power Edge's counterflow FTR obligations to PJM. Or, Gorton and the

Tower Companies may not have taken on such an absurdly risky position. Either way, because Gorton and the Tower Companies did execute their scheme, PJM has suffered tens of millions of dollars in damages.

**The PJM Operating Agreement**

Pursuant to Section 15.2 of the Amended and Restated Operating Agreement of PJM Interconnection, LLC (the "PJM Operating Agreement"), when a member defaults on any obligation to PJM, "the PJM Board shall initiate such action against such Member to enforce such obligations as the PJM Board shall deem appropriate."[1] The PJM Operating Agreement also provides that, upon such a default, PJM may issue a "Default Allocation Assessment" to the non-defaulting members, to require them to pay to PJM their aliquot share of the default. (Op. Agmt. § 15.2.) However, such an allocation "shall in no way relieve the defaulting Member of its obligations," nor does it "limit any rights the LLC may have against the defaulting Member" in PJM's own right. (Id.)

Further, in the event PJM causes a Default Allocation Assessment, PJM may be appointed to sue on behalf of the paying members. Specifically, Section 15.2.1 of the PJM Operating Agreement, which defendants conspicuously ignored, provides as follows:

> By vote at any Members Committee meeting, a majority of the Members that have paid a Default Allocation Assessment may request and appoint the Office of the Interconnection [i.e., PJM] to act as agent on behalf of the Members that have paid a Default Allocation Assessment, solely for the purpose of pursuing and collecting any amounts so assessed[.] In the event that the Office of the Interconnection is appointed as agent for the Members, the Office of the Interconnection shall be authorized to pursue collection through such actions, legal or otherwise, as it reasonably deems appropriate, including but not limited to the prosecution of legal actions and assertion of claims on behalf of the affected

---

[1] A copy of portions of the PJM Operating Agreement was attached by defendants as Exhibit A to D.I. 20. The PJM Operating Agreement is cited herein as "PJM Op. Agmt. § __."

> Members in the state and federal courts as well as under the
> United States Bankruptcy Code . . . .

(PJM Op. Agmt. § 15.2.1.)  If after being so appointed, PJM recovers money from the defaulting

member, then "[a]fter deducting the costs of collection, any amounts received . . . on behalf of

the affected Members shall be distributed to the Members who have paid their Default Allocation

Assessment . . . ." (Id.)

PJM's Complaint does not allege that a Default Allocation Assessment actually occurred.

Moreover, because the Complaint was filed before the expiration of Power Edge's counterflow

FTR obligations, it is not possible that a Default Allocation Assessment could have been made

for the entire amount of Power Edge's eventual default.  Nevertheless, the Complaint does allege

that, regardless of whether there was a partial Default Allocation Assessment, "PJM has been

authorized to institute this action and pursue the claims asserted herein," as is authorized by

Section 15.2.1 of the PJM Operating Agreement.  (D.I. 1, ¶ 53.)

**Defendants' Meaningless References To FERC Actions**

Defendants' Motion raises certain proceedings before the Federal Energy Regulatory

Commission ("FERC"), despite that they have nothing to do with the Complaint.  Defendants

discuss them only to color the Court's objectivity.  Specifically, defendants do not argue that the

FERC proceedings provide a basis to dismiss the Complaint, whether on the grounds of res

judicata, collateral estoppel or otherwise. Therefore, there is no reason to address the FERC

proceedings in this response.  However, should the Court determine that the FERC actions are

relevant, PJM requests that it be provided an opportunity to respond in greater detail to

defendants' characterizations of those actions at an appropriate time.

## ARGUMENT

### I.    PJM HAS STANDING

The Complaint alleges that PJM suffered, through March 2008, approximately $47.6 million in damages as a result of the defendants' coordinated scheme. (D.I. 1, ¶ 136.)  The Complaint also alleges that Power Edge's default was continuing and that PJM would suffer estimated additional damages through the end of May, for a grand total of $50 million to $60 million. (Id., ¶¶ 137-38.)  Incredibly, defendants contend that PJM lacks standing because it somehow was not injured. (D.I. 19 at 13.)  Defendants' strained argument fails for several reasons.

### A.    Defendants Apply The Wrong Standard

The Third Circuit has repeatedly held that, "[f]or the purpose of determining standing, we must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party."  Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3rd Cir. 2003); Mariana v. Fisher, 338 F.3d 189, 205 (3rd Cir. 2003) (same); see also Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 288 (3rd Cir. 2005)  (When reviewing dismissal for lack of standing, circuit court must "accept as true all material allegations of the complaint and construe them in favor of the plaintiff.").

Defendants, however, urge the Court to apply the opposite standard; they say the Court should not take PJM's allegations as true and should not construe them in favor of PJM. (D.I. 19 at 12.)  In support of this proposition, defendants rely on a 1977 case that addressed the unique procedures that were then applied to Sherman Act claims.  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3rd Cir. 1977).  While inapplicable to this case, Mortensen does not say what defendants claim it says, in any event.  To the contrary, Mortensen actually held that

the standard proposed by defendants cannot be applied "until plaintiff's allegations have been controverted" by the filing of an answer. Id. at 892 n.17. Indeed, "[t]here are two types of Rule 12(b)(1) motions. The first type, a <u>facial attack</u>, challenges only the court's subject matter jurisdiction. The second type, a <u>factual attack</u>, allows the court to question the plaintiff's facts <u>after the defendant files an answer</u>. As defendants have not filed an answer, their motion is necessarily a facial attack." <u>Lexington Ins. Co. v. Forrest</u>, 263 F. Supp. 2d 986, 996 (E.D. Pa. 2003) (emphasis added) (citing <u>Mortensen</u>, 549 F.2d at 891). Thus, <u>Mortensen</u> is inapplicable to defendants' pre-answer motion. Moreover, to the extent <u>Mortensen</u> differs from the more recent pronouncements of the applicable standard, it has been superseded. <u>Danvers</u>, 432 F.3d at 288; <u>Storino</u>, 322 F.3d at 296; <u>Mariana</u>, 338 F.3d at 205.

### B. PJM Suffered An Injury-In-Fact

It is ludicrous to claim that PJM did not suffer an injury-in-fact. "To state an injury-in-fact sufficient to survive a motion to dismiss, [PJM] must simply plead that they suffered some concrete form of harm" because of the defendants. <u>Danvers</u>, 432 F.3d at 292. The Complaint alleges that Power Edge defaulted on its contractual obligations to PJM by failing to pay the amounts owed to PJM when due, which caused tens of millions of dollars in money damages to PJM. (D.I. 1, ¶¶ 128-38.) The Complaint further alleges that the default occurred due to defendants' scheme, and that the other defendants manipulated PJM's markets to increase the size of Power Edge's default. (Id.) Thus, PJM has obviously pleaded that its "legally protected interest" has been invaded. "Monetary harm is a classic form of injury-in-fact." <u>Danvers</u>, 432 F.3d at 293.

Defendants' counter-argument is based on a fundamentally flawed proposition: defendants contend that, because PJM had a permissive right to be reimbursed by its members

13

after it was injured, it was not injured in the first place. (D.I. 19 at 13.)  Defendants cite no

authority for this proposition because it is not true; the only case cited by defendants had nothing

to do with reimbursement and, in fact, did not even involve money damages.  Pub. Interest

Research Group v. Magnesium Elektron, 123 F.3d 111 (3rd Cir. 1997).  Taken to its logical

extreme, if defendants' position were the law, then no one with insurance, or any other potential

right to reimbursement from a surety or indemnitor could ever sue for their injuries.  This is

clearly not the case.  Moreover, if PJM is successful in this case and recovers money from

defendants, and if PJM made a Default Allocation Assessment (which has not been alleged), then

it must return an aliquot share of the recovery to the members that paid the Default Allocation

Assessment. (PJM Op. Agmt. § 15.2.1.)

Additionally, defendants' argument is based on a misunderstanding of the PJM Operating

Agreement.  The very section of the agreement cited by defendants in the Motion states that, in

the event of a default by a member, 'the PJM Board shall initiate such action against such

Member to enforce such obligation as the PJM Board shall deem appropriate." (Id., § 15.2.)

Thus, pursuant to the PJM Operating Agreement, the authority to pursue defendants for the

enormous damages they caused expressly rests with PJM, not its members.

Further, defendants' argument ignores the fact that PJM has not been reimbursed for all

of the damages caused by defendants.  PJM's damages are not limited to simply the amount of

Power Edge's default.  For instance, under the RICO counts (Counts I and II), PJM is entitled to

three times the amount of damages caused by defendants -- not just the amount of the default --

and may also be entitled to injunctive relief to prevent defendants from continuing their scheme

in PJM's markets.  18 U.S.C. §§ 1964(a) & (c).  Likewise, pursuant to PJM's breach of fiduciary

duty counts (Counts III and IV), the defendants that participated in the breach may be "stripped

14

of all profits and benefits derived therefrom." Borden v. Sinskey, 530 F.2d 478, 496 (3rd Cir. 1976) (applying Delaware law). And pursuant to the fraudulent transfer count (Count V), PJM is entitled to avoid the $4,000,000 transfer that defendants made to the as-yet-unidentified investors in Power Edge, and may also be entitled to equitable relief, including attachment of defendants or their investors' assets or an injunction. 6 Del. C. § 1307(a).

Based on the foregoing, the Power Edge default is just one part of PJM's damages. Yet even that is not alleged to have been fully reimbursed to PJM, and it logically could not have been. When the Complaint was filed in April, the damages caused by defendants were ongoing because Power Edge's FTR positions extended through the end of May. (D.I. 1, ¶ 137.) Thus, because the most recent amounts of Power Edge's default occurred after the Complaint was filed, they could not, and were not alleged to, have been the subject of a Default Allocation Assessment. Indeed, the Complaint does not allege that a Default Allocation Assessment was ever made. For all these reasons, defendants' contention that PJM has been wholly reimbursed by its members is simply wrong.

Finally, even if every cent of every type of damage had been reimbursed to PJM through a Default Allocation Assessment -- which is obviously not the case -- PJM still has standing. This is because PJM has been appointed by its members to collect Power Edge's default pursuant to Section 15.2.1 of the PJM Operating Agreement, which provides as follows:

> By vote at any Members Committee meeting, a majority of the Members that have paid a Default Allocation Assessment may request and appoint the Office of the Interconnection [i.e., PJM] to act as agent on behalf of the Members that have paid a Default Allocation Assessment, solely for the purpose of pursuing and collecting any amounts so assessed [.] In the event that the Office of the Interconnection is appointed as agent for the Members, the Office of the Interconnection shall be authorized to pursue collection through such actions, legal or otherwise, as it reasonably deems appropriate, including but not limited to the prosecution of

> legal actions and assertion of claims on behalf of the affected
> Members in the state and federal courts as well as under the United
> States Bankruptcy Code . . . .

(PJM Op. Agmt. § 15.2.1.)    Here, even if PJM issued a preliminary Default Allocation

Assessment (which is not alleged), the Complaint specifically alleges that PJM's members

authorized it to bring this action.  (D.I. 1, ¶ 53.)  Thus, for each of the foregoing reasons, PJM

has standing.

## II.    PJM HAS SUFFICIENTLY PLEADED A RICO CLAIM

### A.  PJM Has Sufficiently Pleaded A Scheme To Defraud and Predicate Acts

#### i.  Appropriate Standard

As an initial matter, the Court must accept as true all allegations contained in PJM's

Complaint and must also allow PJM 'the benefit of all reasonable inferences drawn from the

allegations contained in the complaint." Breyer v. Meissner, 214 F.3d 416, 421 (3rd Cir. 2000);

see also Nielsen Elecs. Inst. v. Student Fin. Corp., No. Civ. A. 99-285-JJF, 2001 WL 34367324,

at *3, 6 (D. Del. Jan. 16, 2001) (Farnan, J.) (stating the Third Circuit requires a court faced with

a motion to dismiss to read the complaint 'generously").    "[T]he pleading standard can be

summed up thus:  stating . . . a claim requires a complaint with enough factual matter (taken as

true) to suggest the required element.    This does not impose a probability requirement at the

pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that

discovery will reveal evidence of the necessary element." Phillips v. County of Allegheny, 515

F.3d 224, 234 (3rd Cir. 2008) (internal quotations omitted) (citing Bell Atlantic Corp. v.

Twombly, -- US --, 127 S. Ct. 1955, 1965 (2007)).

16

ii.  **A Scheme to Defraud Can Include Elements of Lawful Conduct**

Defendants argue that because the predicate acts of mail and wire fraud they committed are, on their face, "completely lawful conduct," PJM has "fail[ed] to plead predicate acts" and, hence, its RICO claims should be dismissed. (D.I. 19 at 16.) But defendants get it wrong in two ways: first, they misstate the law and misapply cases that are wholly inapposite in an attempt to subject PJM to incorrect legal standards.   Second, defendants misstate PJM's Complaint, ignoring factual allegations expressly set forth therein.

Contrary to defendants' contention, a scheme to defraud 'need not be fraudulent on its face; rather, it must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Nielsen Elecs. Inst., 2001 WL 34367324, at *5 (emphasis added) (internal quotations omitted); see also Durland v. U.S., 161 U.S. 306, 313 (1896); U.S. v. Pearlstein, 576 F.2d 531, 535 (3rd Cir. 1978).  As the Supreme Court explained in Durland over one hundred years ago, it is the fraudulent purpose that makes seemingly lawful acts punishable as fraud:

> Punishment because of the fraudulent purpose is no new thing.…  If a person buy goods on credit in good faith, knowing that he is unable to pay for them at the time, but believing that he will be able to pay for them at the maturity of the bill, he is guilty of no offense, even if he is disappointed in making such payment.  But if he purchases them knowing that he will not be able to pay for them, and with an intent to cheat the vendor, this is a plain fraud, and made punishable as such.…

161 U.S. at 313 (internal quotations omitted) (quoting Evans v. U.S., 153 US 584, 592 (1894)). In other words, the same action -- buying goods on credit and later defaulting -- can be legal, if performed without fraudulent purpose, but illegal if performed with the intent to deceive.

That is exactly what PJM alleges -- that Gorton and the Tower Companies intended to deceive and defraud PJM (and others) when they created the numerous sham corporations and

misrepresented the corporations' true nature, and they knowingly did so in order to receive credit and participate in PJM's markets, both of which were necessary to further their scheme and manipulate those markets to unlawfully reap millions of dollars. (See, e.g., D.I. 1, ¶¶ 48-49, 54, 110-14, 121, 128-130, 150, 163-64.) Accordingly, although defendants' scheme may contain components of conduct that, under certain circumstances, appear lawful on their face, just like buying books on credit in the Durland example, defendants' intent to deceive transforms their conduct into a fraudulent scheme.

Still, defendants go to great lengths to make the scheme look like ordinary, "lawful conduct." (D.I. 19 at 16.) They waste a lot of pages extracting bits and pieces of their fraudulent scheme and arguing that each piece separately was "lawful conduct." Id. For example, defendants argue that because the Trading Companies were permitted to trade in PJM's markets, PJM has not alleged fraud. (Id.) Yet the Complaint does not allege that a company's trading on its own account was fraudulent. Nor does it allege that "risky trades" are per se violative of RICO, even though defendants argue as if it does. (D.I. 19 at 19.)[2]

Without doubt, Gorton and the Trading Companies' scheme to defraud PJM was much more complicated and sophisticated than just making risky trades: they devised a complex scheme where they created and maintained control of several sham Trading Companies and received millions of dollars of credit from PJM to obtain authorization to trade with the specific intent to allow any Trading Company that lost money to default without consequence. Concomitantly, they intended and knowingly used the solvent Trading Companies to make

---

[2]    Defendants assert that PJM agrees that each of the Trading Company's applications to PJM "truthfully state[d] the relationship of each entity with the other defendants." (D.I. 19 at 4.) This is simply not the case. The Complaint repeatedly alleges that defendants did not truthfully represent the Trading Companies' relationship to Gorton and the other defendants. (Eg. id., ¶¶ 48-49, 54, 110-15.)

trades in order to exacerbate that default and reap millions of dollars of profits in contrary trades -- all to the detriment of PJM, the other market participants, and ultimately, the consumer. In fact, it was exactly because defendants' conduct appeared "lawful" that their scheme was successful for many months. It is simply disingenuous -- and legally inappropriate -- to take one component of a multi-faceted scheme and argue that, because that component standing alone was legal on its face, there was no scheme to defraud. Indeed, if this was the correct standard, many sophisticated defrauders would get away with their fraud.

### iii.  The Predicate Acts Can Include Elements of Lawful Conduct

Likewise, the mailings and wire transmissions that constitute the RICO predicate acts need not be fraudulent on their face.[3] U.S. v. Maze, 414 U.S. 395, 410 (1974) (agreeing with the lower court's instruction that "[t]he mail matter need not disclose on its face a fraudulent representation or purpose, but need only be intended to assist in carrying out the scheme to defraud"); Schmuck v. U.S., 489 U.S. 705, 715 (1989) ("[I]nnocent mailings -- ones that contain no false information -- may supply the mailing element" and "the elements of mail fraud [can] be satisfied where the mailings [are] routine."); Nielsen Elecs. Inst., 2001 WL 34367324, at *5; U.S. v. Hevener, 382 F. Supp. 2d 719, 724 (E.D. Pa. 2005). "Mailings designed to 'lull' the victim into a false sense of security, or to postpone inquiries or complaints, or to make the transaction less suspect are mailings in furtherance of the fraudulent scheme." Hevener, 382 F. Supp. at 724 (quoting U.S. v. Shively, 927 F.2d 804, 814 (5th Cir. 1991)). In fact, the mailings and wire transmissions need not be an "essential element of the scheme" -- it is sufficient that they simply furthered the scheme. U.S. v. Adamo, 534 F.2d 31, 36 (3rd Cir. 1976).

---

[3]    "In determining whether an entity has committed the predicate acts of mail fraud and wire fraud courts have traditionally applied the same analysis for both offenses." Nielsen Elecs. Inst., 2001 WL 34367324, at *4.

At any rate, PJM's Complaint expressly alleges that the mailings and documents transmitted by wire at issue contained misrepresentations, and that those misrepresentations were necessary to further Gorton's and the Trading Companies' scheme. (D.I. 1, ¶¶ 54, 110-15.)

To support their argument that the alleged predicate acts are insufficient because they are "lawful," defendants rely heavily on Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173 (3rd Cir. 2000). This reliance, however, is misplaced. In Doug Grant, the predicate acts were not mail or wire fraud; they were based on Casino Control Commission ("CCC") violations and included limiting customers to one hand of blackjack at a time, lowering betting limits, and shuffling at will. Id. at 184. The court stated that these acts were not actually CCC violations and thus they did not constitute predicate acts under RICO. Id. at 185. Here, the predicate acts are mail and wire fraud and the case law is clear that even "innocent" mailings or wire transmissions constitute violations of the mail and wire fraud statutes when in furtherance of a scheme to defraud. Schmuck, 489 U.S. at 715.

Defendants also base their "lawful conduct" argument in large part on Genty v. Resolution Trust Group, 937 F.2d 899 (3rd Cir. 1991). But defendants confuse what must be pleaded with what must be proved. The question in Genty was whether the district court committed error by directing a verdict at the close of evidence during trial. Genty, 937 F.2d at 914-15. The Genty court did not, as defendants contend, hold that "plaintiff failed to state a RICO claim." (D.I. 19 at 17.) Whether a directed verdict after a trial on the merits was proper has absolutely nothing to do with whether a plaintiff's complaint pleads facts that, taken as true, state a RICO claim.

At any rate, Genty is factually distinguishable as well. The Genty plaintiffs premised violations of the mail fraud statute on activity that did not involve the mail: the writing of

internal memoranda, the awareness that a brochure did not disclose the location of a landfill, and attempts to drain and clean a lake. Genty, 937 F.2d at 915. In stark contrast, PJM's Complaint unmistakably alleges specific mailings and wire transmissions that constitute illegal activity under the mail and wire fraud statutes and, thus, fulfills RICO's predicate acts requirement.

Like their mistaken reliance on Genty, defendants cite Annulli v. Panikkar, 200 F.3d 189 (3rd Cir. 1999), a case that involves a summary judgment motion -- not a Rule 12(b)(6) motion. For this reason alone, Annulli is of no precedential value. But defendants also rely on Annulli to argue that because Power Edge's default breached the PJM Operating Agreement, it is nothing more than a "simple breach of contract" and "not a predicate act of racketeering activity." (D.I. 19 at 20.) This statement mischaracterizes Annulli, completely distorts PJM's allegations and shows a fundamental misunderstanding of the predicate-acts requirement of RICO. In Annulli, plaintiff "made no allegation that the Defendants committed one of the state law crimes defined as racketeering activity in [the RICO statute]" and "provided no evidence that the Defendants engaged in § 1961(1)(B) mail fraud [or] wire fraud ...." 200 F.3d at 199, 200. Instead, the fraudulent activity alleged by plaintiff was theft by deception, which is not actionable under RICO. Id. Accordingly, the Annulli court stated that "theft by deception, like a simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity ...." Id. at 199. Annulli does not stand for the proposition -- as defendants would have this Court believe -- that when a scheme to defraud involves, among other things, a breach of contract, the predicate acts of mail and wire fraud that have been pleaded are somehow irrelevant.

Defendants similarly mischaracterize Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406 (3rd Cir. 1991). In Kehr Packages, after assuming the complaint sufficiently alleged a scheme to

21

defraud against defendants Cohen and Noon, the court analyzed a third defendant's -- Donnelly's -- actions for purposes of determining the "continuity" prong of a RICO claim. Id. at 1414-15. The court stated that, unlike Cohen and Noon, Donnelly's actions contained no indication of deception and, therefore, could not be used for purposes of finding continuity. Id. at 1417. The court held that the mail fraud statute "implicates only plans calculated to deceive" and Donnelly's actions were not calculated to do so. Id. Here, however, the Complaint specifically alleges Gorton's and the Tower Companies' actions were calculated to deceive. (See, e.g., D.I. 1, ¶¶ 49, 54, 111, 113-14, 121, 149, 163-64.) Moreover, the question of what constitutes a fraudulent act for purposes of continuity is fundamentally different than the question of whether a complaint states a RICO claim.

Reynolds v. East Dyer Development Co., 882 F.2d 1249 (7th Cir. 1989), a Seventh Circuit case relied on by defendants, is equally inapplicable.[4] The Reynolds court found that since the complaint did not "allege[] or show[] that the defendants lied to them -- or anybody else -- about soil conditions," there was no scheme or artifice to defraud. Id. at 1251-52. Again, in direct contrast, PJM's Complaint is replete with allegations that Gorton and the Tower Companies (and persons at the direction of Gorton and the Tower Companies) misrepresented the true nature of the numerous Trading Companies -- and did so for the purpose of defrauding PJM. (See, e.g., D.I. 1, ¶¶ 49, 54, 111, 113-14, 121, 149, 163-64.) Reynolds is plainly inapposite.

Lastly, Midwest Grinding Co. v. Spitz, 976 F.2d 1016 (7th Cir. 1992), is also inapplicable. Again, this is a Seventh Circuit case and, again, this case involves a summary

---

[4]    Given the large body of RICO case law in the Third Circuit and district courts of the Third Circuit, it is surprising that defendants turn to another Circuit's case law in an effort to argue that PJM's Complaint fails to state a RICO claim.

22

judgment motion -- not a motion to dismiss at the pleading stage. <u>Id.</u> at 1019. Also, the court was analyzing defendants' conduct for RICO's "continuity" prong, making <u>Midwest Grinding Co.</u> inapposite.

*               *               *

Clearly, predicate acts may include elements of lawful conduct, and none of defendants' cases even suggest otherwise.

### B.  <u>PJM Has Sufficiently Pleaded Injury</u>

#### i.  <u>The Court Must Accept The Allegations Regarding Injury As True</u>

Defendants argue that for purposes of deciding a motion to dismiss based on whether a RICO injury was sufficiently alleged, "no presumptive truthfulness attaches to plaintiff's allegations." (D.I. 19 at 12.) As explained above, in Section I.A., defendants are wrong: the Third Circuit has repeatedly held that, "[f]or the purpose of determining standing, [courts] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party." <u>Storino</u>, 322 F.3d at 296; <u>see also Mariana</u>, 338 F.3d at 205; <u>Danvers Motor Co.</u>, 432 F.3d at 288. Consequently, any "factual attack" pursuant to Rule 12(b)(1) can only be made after defendants file their answer. <u>Lexington Ins. Co.</u>, 263 F. Supp. 2d at 996.

Unbelievably, defendants rely on <u>Maio v. Aetna, Inc.</u>, 221 F.3d 472 (3rd Cir. 2000), a case that, while acknowledging a circuit split, actually supports PJM's position that the allegations concerning the injury element of RICO must be accepted as true. The <u>Maio</u> court explained that, while the courts have designated the RICO section requiring an injury as the "standing" provision, "[the Third Circuit's] method of analysis in prior cases has been to consider issues of RICO and antitrust standing in the context of reviewing motions to dismiss

23

pursuant to Rule 12(b)(6), despite the fact that the 'injury to business or property' and proximate causation requirements are considered aspects of the plaintiff's 'standing' to sue under section 1964(c) of RICO ...." 221 F.3d at 482 n.7.[5]

Indeed, the Third Circuit embraced the <u>Maio</u> approach when it affirmed a dismissal pursuant to Rule 12(b)(6) because "Civil RICO 'standing' is usually viewed as a 12(b)(6) question of stating an actionable claim, rather than as a 12(b)(1) question of subject matter jurisdiction." <u>Anderson v. Ayling</u>, 396 F.3d 265, 269 (3rd Cir. 2005); <u>see also</u> <u>Township of Marlboro v. Scannapieco</u>, --- F. Supp. 2d ---, No. 07-4988 (JAP), 2008 WL 1820897, at *7 n.6 (D.N.J. Apr. 23, 2008) (citing <u>Maio</u> and <u>Anderson</u>).

Consequently, the weight of authority supports the application of the Rule 12(b)(6) standard to the question of whether PJM sufficiently pleaded a RICO injury, and this Court should accept as true the "injury-allegations" pleaded in PJM's Complaint.

### ii.  PJM Has Sufficiently Pleaded Injury

Defendants argue that PJM has not alleged a RICO injury. (D.I. 19 at 20.) As explained more fully in Section I.B., above, defendants' argument is premised on a flawed legal theory. PJM's Complaint specifically alleges that Gorton and the Tower Companies "used the trading companies to extract millions of dollars from PJM's FTR markets, while at the same time allowing one of the Trading Companies -- Power Edge -- to incur an enormous default in its obligations to PJM and its members." (D.I. 1, ¶ 50.) PJM also alleges that, due to defendants' scheme to defraud PJM, one of defendants' sham companies, Power Edge, owes PJM almost $50 million and that the total amount will ultimately be even higher. (<u>Id.</u>, ¶ 51.) Plainly, the Complaint alleges a massive injury.

---

[5]     The <u>Maio</u> court did not resolve this issue concretely, however, because both parties characterized the motion to dismiss as one based on Rule 12(b)(6). 221 F.3d at 482 n.7.

### III.    PJM'S COMPLAINT SATISFIES RULE 9(b)

Defendants also claim PJM's Complaint should be dismissed because it does not satisfy Rule 9(b)'s pleading requirements. (D.I. 19 at 21.) "The Third Circuit has adopted a generous standard with regard to Rule 9(b)'s particularity requirements, noting that in applying the rule, focusing exclusively on its 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." Saporito v. Combustion Eng'g, Inc., No. 86-1998, 1988 WL 142406, at * 3 (D.N.J. Dec. 5, 1988) (internal quotations omitted). Indeed, as one of defendants' cases held, "Rule 9(b) must be applied in conjunction with the liberal pleading policy of Rule 8(a)(2) which provides that a pleading shall contain a short and plain statement of the claim." Temple v. Haft, 73 F.R.D. 49, 52 (D. Del. 1976) (internal quotations omitted). "[Th]e requirement of particularity does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." Household Int'l, Inc. v. Westchester Fire Ins. Co., 286 F. Supp. 2d 369, 373 (D. Del. 2003) (Farnan, J.); see also Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 441 (D. Del. 1999) (Farnan, J.). "If the pleaded facts and supporting allegations permit the inference of a colorable claim for fraud and afford the defendant notice as to which actions or communications are alleged to have been fraudulent, the complaint will withstand a motion to dismiss." In re Midlantic Corp. Shareholder Litig., 758 F. Supp. 226, 231 (D.N.J. 1990). Particularly apropos here, "[c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3rd Cir. 1989).

Here, PJM's Complaint readily satisfies Rule 9(b)'s pleading standards:

25

- The Complaint describes in detail the defendants and other participants in the scheme. (D.I. 1, ¶¶ 5-12.)

- The Complaint exhaustively explains PJM's markets and how trades and FTRs work. (Id., ¶¶ 16-45.)

- The Complaint explains how Gorton and the Tower Companies managed and controlled the Trading Companies. (Id., ¶¶ 46-48.)

- The Complaint alleges that Gorton and the Tower Companies devised a scheme to allow unsuccessful Trading Companies to default without consequence while simultaneously reaping the profits of the other Trading Companies. (Id., ¶ 49.)

- The Complaint thoroughly identifies the Trading Companies and the particular mailings and wire transmissions that constitute predicate acts, including their dates and the senders and recipients. (Id., ¶¶ 54-109.) The mailings are also attached as exhibits to the Complaint. (Id.)

- The Complaint particularizes how the sham companies were used to perpetuate the scheme, and how the mailings and wire transmissions were untrue and manipulative, and that Gorton and the Tower Companies knew they were untrue and manipulative. (Id., ¶¶ 110-14.)

- The Complaint identifies in exhaustive detail how the scheme unfolded to defendants' detriment and how and why Power Edge ultimately defaulted. (Id., ¶¶ 116-38.)

- The Complaint, then, describes in detail how defendants furthered their scheme by submitting manipulative bids that exacerbated Power Edge's loss, but increased the other Trading Companies' gains. (Id., ¶¶ 128-32.)

Ironically, despite the empty rhetoric of defendants' Motion, the Complaint is a model of Rule 9(b) pleading.

Under Household Int'l, Inc., PJM's Complaint certainly contains more than "sufficient factual specificity to provide assurance that [PJM] has investigated the alleged fraud and reasonably believes that a wrong has occurred." 286 F. Supp. 2d at 373. Further, it is apparent

26

that PJM's Complaint is factually specific enough to "permit the inference of a colorable claim for fraud." In re Midlantic Corp. Shareholder Litig., 758 F. Supp. at 231.

Defendants cite Temple to support their Rule 9(b) argument, but the Temple court stated that, regarding one of two complaints on which it opined, "no connection [was] made between a particular document or even category of documents and a particular false representation or material omission." 73 F.R.D. at 54. That is obviously not the case here. As outlined above, PJM described particular documents and the misrepresentations contained within them and explained how these documents and misrepresentations furthered defendants' scheme.

The Temple court also opined on a second complaint, stating that because the operative mechanism of the fraud (a corporate merger) and the purpose of the fraud (to freeze out minority shareholders) were alleged, Rule 9(b) was satisfied. Id. at 56. PJM's Complaint is no different. It alleges the operative mechanism of the fraud (the creation of the sham entities and the manipulative trades) and the purpose of the fraud (to extract millions of dollars from PJM by planning to allow unsuccessful companies to default without consequence). Indeed, it is difficult to imagine what additional facts could be asserted, especially when defendants' internal affairs, such as the identity of their investors, are exclusively within defendants' control. Craftmatic Sec. Litig., 890 F.2d at 645 ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control."). In sum, defendants' argument that the Complaint does not satisfy Rule 9(b) completely lacks merit.

## IV.    THE COURT HAS JURISDICTION OVER PJM'S STATE LAW CLAIMS

The Court has original jurisdiction over PJM's state-law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to the federal RICO claims that they form part of the same case or controversy. Defendants claim that the RICO claims fail and, therefore, that the Court should dismiss the state law claims.

For the reasons set forth above, PJM has sufficiently pleaded RICO claims in this matter. Thus, there is no basis to dismiss the state-law claims. Alternatively, in the event that the Court determines that PJM did not adequately plead a RICO claim, the Court may exercise its discretion whether to retain jurisdiction over the state law claims, or require that they be brought in state court. 28 U.S.C. § 1367(c); Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 276 (3rd Cir. 2001). Contrary to defendants' claim that the Court "should" decline to exercise supplemental jurisdiction, it is entirely up to the Court's discretion. Here, in ruling on this Motion, the Court will acquire a level of familiarity with the complex background facts concerning energy markets and financial transmissions rights, which are not generally known. The Court may thus determine that it should retain jurisdiction over this matter instead of requiring another court to get up to speed on these issues.

## V.    ANY SERVICE DEFECTS HAVE BEEN CURED

PJM agrees that, as described by defendants, the service on TRC and Gorton was not proper. Accordingly, counsel for PJM contacted defendants' counsel to request that they accept service on TRC's and Gorton's behalf so that the case could proceed with all defendants at once.[6] Defendants' counsel refused. (Id.) Accordingly, PJM re-served both TRC and Gorton. (Id., at ¶ 4.) As such, defendants' objections to service are now moot.

---

[6]    See Declaration of Richard G. Douglass at ¶ 3, a copy of which is attached as Exhibit A.

## CONCLUSION

For all of the foregoing reasons, PJM respectfully requests that the Court deny Defendants' Motion To Dismiss Under Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(5) And 12(b)(6).

CONNOLLY BOVE LODGE & HUTZ, LLP

Dated: June 3, 2008                    By:  _/s/ Collins J. Seitz, Jr._
                                            Collins J. Seitz, Jr. (#2237)
                                            The Nemours Building
                                            1007 North Orange Street, 8th Floor
                                            P.O. Box 2207
                                            Wilmington, DE 19899
                                            Tel: 302-658-9141
                                            Fax: 302-656-0116

                                            Eric N. Macey
                                            Richard G. Douglass
                                            Molly S. DiRago
                                            NOVACK AND MACEY LLP
                                            100 North Riverside Plaza
                                            Chicago, IL 60606
                                            Tel: 312-419-6900
                                            Fax: 312-419-6928

                                            _Attorneys for Plaintiff PJM Interconnection, LLC_

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PJM INTERCONNECTION, LLC, directly and )
derivatively on behalf of Power Edge, LLC, )
                               )
           Plaintiff,            )
                               )   CIVIL ACTION
v.                             )
                               )
MARK GORTON, TOWER RESEARCH )   No.: 1:08-cv-00216-JJF
CAPITAL LLC, TOWER RESEARCH )
CAPITAL INVESTMENTS, LLC, ACCORD )
ENERGY, LLC, BJ ENERGY, LLC, )
FRANKLIN POWER, LLC, GLE TRADING, )
LLC, OCEAN POWER, LLC, PILLAR FUND, )
LLC, and POWER EDGE LLC, )
                               )
                               )
          Defendants.          )

## DECLARATION OF RICHARD G. DOUGLASS

     1.    I am an attorney employed by the law firm of Novack and Macey LLP, counsel

for Plaintiff, PJM Interconnection, LLC in this matter.

     2.    On or about May 20, 2008, I spoke via telephone to Richard J.L. Lomuscio

("Lomuscio"), counsel for Defendants in this action, regarding Defendants Mark Gorton's

("Gorton") and Tower Research Capital, LLC's ("TRC") objections to service of process.

     3.    During that call, I agreed that the service on Defendants Gorton and TRC, as

described by Defendants in their Motion to Dismiss, was not proper. I then requested that

Lomuscio agree to accept service on behalf of Gorton and TRC to avoid the cost and delay that

would be occasioned by requiring Plaintiff to re-serve Gorton and TRC. Lomuscio refused my

request.

4.      Accordingly, on May 22, 2008, Plaintiff re-served TRC in the manner described as proper by Defendants in their Motion to Dismiss, and re-served Gorton pursuant to 6 Del C. § 18-109(a) and the Delaware Long Arm Statute. (D.I. 25; D.I. 26.)

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 3, 2008

                                              Richard G. Douglass

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PJM INTERCONNECTION, LLC, directly and derivatively on behalf of Power Edge, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>MARK GORTON, TOWER RESEARCH CAPITAL LLC, TOWER RESEARCH CAPITAL INVESTMENTS, LLC, ACCORD ENERGY, LLC, BJ ENERGY, LLC, FRANKLIN POWER, LLC, GLE TRADING, LLC, OCEAN POWER, LLC, PILLAR FUND, LLC, and POWER EDGE LLC,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION<br>)<br>)   No.: 1:08-cv-00216-JJF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I, Collins J. Seitz, Jr., hereby certify that on June 3, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven J. Fineman, Esquire
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899
> (302) 658-6541
> Email: fineman@rlf.com

> */s/ Collins J. Seitz, Jr.*
> Collins J. Seitz, Jr. (#2237)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> Wilmington, DE 19899
> Phone: (302) 658-9141
> cseitz@cblh.com